## In re Anonymous No. 22 D.B. 85

Disciplinary Board Docket No. 22 D.B. 85

PADOVA, *member*, October 20, 1986 — To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

Pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d) the disciplinary board of the

Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the petition for discipline captioned above.

## STATEMENT OF THE CASE

We are here called upon to consider the recommendation of hearing committee [   ] that respondent, [   ], be disbarred from the practice of law in Pennsylvania. The instant petition for discipline alleges professional misconduct with reference to two charges. Charge I relates to respondent's representation of [A] (now [   ]) in a personal injury claim against [B] Inc. It is alleged that respondent submitted a release to [B's] insurer on which complainant's signature was forged; after which he received a settlement check for $4,500 onto which he caused complainant's endorsement to be forged; that he thereafter failed to notify complainant of the receipt of her funds or to make prompt distribution and that he misappropriated complainant's portion of those funds for his own purposes and benefit, misrepresenting the circumstances concerning this transaction to complainant's new counsel. Two years and four months after receipt thereof, respondent paid complainant the funds due her under threat of disciplinary proceedings. The second charge involves respondent's conduct in representing the estate of [C], deceased, as administrator and counsel. Essentially, respondent is charged with failing to file necessary documents, pay inheritance taxes and converting estate proceeds to his own use, again misrepresenting to the beneficiaries the disposition of estate funds. After hearing testimony in the matter, the hearing committee found, inter alia, violations of disciplinary rule 1-102(A)(3) (illegal con-

duct involving moral turpitude), disciplinary rule 1-102(A)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation), disciplinary rule 1-102(A)(5) (engaging in conduct prejudicial to the administration of justice), disciplinary rule 1-102(A)(6) (conduct which adversely reflects on fitness to practice law), disciplinary rule 6-101(A)(3) (neglecting a legal matter), disciplinary rule 7-101(A)(2) (intentionally failing to carry out a contract of employment entered into with a client for professional services, disciplinary rule 7-102(A)(2) (knowingly and in bad faith advancing a claim unwarranted under existing law), disciplinary rule 9-102(A) (commingling), disciplinary rule 9-102(B)(1) (failing to promptly notify a client of receipt of funds), disciplinary rule 9-102(B)(3) (maintaining incomplete records of clients' funds), disciplinary rule 9-102(B)(4) (failing to promptly pay to a client, as requested by the client, funds in the lawyer's possession which the client is entitled to receive). The hearing committee conducted hearings on this matter *without* the presence of respondent or counsel but after due notice and a full opportunity for respondent to develop and participate in the defense of his case. After review of the entire matter, we are constrained to adopt the findings and recommendations of the hearing committee and recommend to the Supreme Court of Pennsylvania that the sanction of disbarment is appropriate.

## HISTORY OF PROCEEDINGS

The petition for discipline was docketed in the disciplinary board on March 20, 1985. It was served on respondent on March 26, 1985. Respondent filed no answer and, pursuant to rule 208(b)(3)

Pa.R.D.E., the charges were deemed at issue. The petition was initially referred for disciplinary hearing to hearing committee [   ]. However, due to the unavailability of one of the members of that committee, the board notified the parties, on May 22, 1985, that it had reassigned the petition to hearing committee [   ] ([D], chairperson [E] and [F]). On May 29, 1985, petitioner requested the hearing committee and respondent to provide marked-up calendars to facilitate scheduling of the pre-hearing conference. On June 7, 1985, notices were sent to respondent, the hearing committee, and others, scheduling a pre-hearing conference for June 20, 1985, and scheduling hearings for July 16 and 23, 1985. A notice to respondent by certified mail at his registered office address was returned by the post office marked "unclaimed." On June 20, 1985, respondent did not appear for pre-hearing conference. At the direction of the hearing committee, the pre-hearing conference was rescheduled for June 27, 1985. Respondent was so notified by letter dated June 20, 1985, sent to respondent by certified mail, return receipt requested; first class mail; hand delivery. The certified letter was returned by the post office marked "unclaimed." Respondent did not appear. By letter to Chairman [D] dated June 28, 1985, copies to respondent by *regular* and certified mail, counsel for petitioner confirmed the continuance of the pre-hearing conference to July 23, 1985. On July 5, 1985, petitioner sent to respondent a notice of pre-hearing conference for July 23, 1985. On July 11, 1985, petitioner caused respondent to be served with a subpoena for July 23, 1985. On that date, petitioner also advised respondent in a telephone conversation of a scheduled hearing date of July 23, 1985. By letter dated July 17, 1985, to Chairman

[D], respondent stated, inter alia, "Unfortunately, my schedule does not permit my attending arbitrarily scheduled hearings or conferences. Hopefully, at some point in time, we may be able to establish mutually convenient dates to expedite these matters." Respondent failed to attend the scheduled pre-hearing conference on July 23, 1985. By letter dated July 23, 1985, Chairman [D] advised respondent that he had directed the rescheduling of a formal hearing in September and the rescheduling of a pre-hearing conference prior thereto. He urged respondent's cooperation and written advice to petitioner as to his availability.

By letter dated July 25, 1985, to the hearing committee, copy to respondent by regular and certified mail, with enclosure, which was signed for, apparently by respondent, petitioner sent a calendar for the month of September 1985, requesting that the hearing committee and respondent each advise of availability during that month.

By letter dated August 9, 1985, postmarked August 12, 1985, respondent set forth his schedule for portions of August through October 1, 1985. The schedule was vague as to his availability or reasons for unavailability but did not include any "available" date for September. The letter does include the following listings:

"September 23 – September 30    Out of town
October 16 – October 20        Office
October 23 – October 27        [   ]"

Therefore, at the direction of hearing committee member [F], acting in [D's] absence, notices dated August 15, 1985, were mailed to the hearing committee and respondent advising of the rescheduling of the pre-hearing conference for September 6,

1985, and the hearing for September 24 and 30, 1985. In addition, a cover letter requesting that respondent contact [F] if he would be available on any of 11 alternate dates was sent to respondent by certified and first class mail and apparently received by respondent. There is no record that any contact was made by respondent.

A subpoena was issued for respondent's appearance on September 6, 24 and 30, 1985, and personally served on him on August 15, 1985. Respondent failed to honor the subpoena.

By letter of August 27, 1985, [D] further advised respondent of the scheduling of the September hearings and advised of the necessity of his appearance. By letter dated September 4, 1985, to [D], copies to petitioner and the other hearing committee members, respondent advised that he would not appear on the scheduled dates.

Respondent did not appear on September 6 for the pre-hearing conference. At petitioner's request, [D] obtained permission of the disciplinary board to make an additional effort to reschedule the hearing. By letter from petitioner to [D], copy to respondent, dated September 11, 1985, respondent was asked to communicate with petitioner's counsel or [D] to advise of all available dates in October. The uncontested allegation of petitioner is that the certified mail copy of that letter to respondent was returned marked "unclaimed" but the first-class copy was not returned. The uncontested allegation of petitioner is that telephone messages were also left for respondent but were not returned.

By notice dated September 19, 1985, under cover of a letter dated September 19, 1985, the hearing was rescheduled for October 17 and 23, 1985. We note that these are dates on which respondent had

stated that he would be "in his office" or "in [ ]." A subpoena was issued on October 11, 1985, for respondent's appearance on those dates but despite over 20 efforts on six separate days, he could not be located to be served.

The hearing was held on October 17 and 23, 1985, before [D], chairman of hearing committee [ ] and [E], member. The hearing was conducted before the two available hearing committee members as permitted by rule 206(a). Respondent did not appear. In a letter dated October 30, 1985, to petitioner, respondent referred to "our November 17 conference." Thereafter, he attempted to contact acting Chief Disciplinary Counsel [ ], but never contacted [D] or action counsel.

By letter dated January 21, 1986, from respondent to disciplinary counsel, respondent demanded a public hearing on the charges filed against him. By letter dated May 19, 1986, respondent notified your honorable court that he would file a "petition for appointment of special committee for hearing of allegations of misconduct" by June 3, 1986. By letter dated May 29, 1986, disciplinary counsel notified your honorable court that a response to respondent's pleading would be filed upon respondent's filing on June 3, 1986. To our knowledge, no such petition was filed with the Supreme Court. By letter dated July 8, 1986, to Chairman [D], respondent requested a "reopening of the record." On July 9, 1986, hearing committee [ ] filed its report with the board, who in turn, on the same day, sent a letter to the parties enclosing a copy of the report of hearing committee. On July 24, 1986, the disciplinary counsel notified the board of its request that respondent's petition to reopen be denied.

On September 3, 1986, the disciplinary board received from respondent a pleading titled "Respon-

dent's Exceptions to Report Findings and Recommendations of Committee [ ]." This entire matter came before the disciplinary board for adjudication on September 4, 1986.

Upon review of the entire record in this proceeding, including the report, findings and recommendations of hearing committee [ ], the disciplinary board of the Supreme Court of Pennsylvania denies respondent's petition to reopen and recommends that the instant petition for discipline be sustained and that respondent be disbarred from the practice of law in the commonwealth of Pennsylvania with costs of these proceedings to be paid by respondent.

## RESPONDENT'S REQUEST TO REOPEN RECORD

The most severe type of discipline that your honorable court is empowered to impose for misconduct by a member of our bar has been recommended by hearing committee [ ] and now the disciplinary board of the Supreme Court of Pennsylvania. This sanction results from hearings that were conducted *without* the presence of respondent or counsel on his behalf. Mindful of our responsibility to the bar as well as the public, we have scrutinized this record carefully to see whether respondent had been afforded the full and fair *opportunity* to develop, participate and present a defense to these charges. Almost nine full months after hearings were concluded (October 23, 1985) respondent requested a reopening of the record. In his request, respondent asserts: (1) that the record is "incomplete without a defense"; (2) that he was not "aware of a hearing on October 17 and 23, 1985"; (3) that he would have been unable to attend if he were aware because of the "terminal illness of his mother"

which required his efforts to "coordinating doctor visits and other arrangements for medical treatment" during the months of August, September and October 1985; and (4) that respondent now has evidence which will vindicate him although he does need discovery. Hearing committee [    ] found the following as fact:

"(166) Respondent failed to participate in this disciplinary proceeding, failed to cooperate with the petitioner and the hearing committee, failed to appear for pre-hearing conferences and hearings in this proceeding after given notice of such conferences and hearings, and failed to respond to many attempts by petitioner to communicate with respondent for the purpose of scheduling a conference or hearing at a mutually convenient time. Said failure of respondent was willful and reflected a contemptuous attitude toward the hearing committee and the disciplinary system.

"(167) Respondent failed to show any circumstances or cause which would excuse respondent's failure to participate in this proceeding and his failure to cooperate with petitioner and the hearing committee as set forth in the foregoing paragraph. . . ."

The record supports findings 166 and 167 fully. Respondent in this case failed to file an answer. Nine conference and hearing dates were scheduled by the hearing committee, the first of which was June 20, 1985. Of the nine listings, the record clearly indicates that respondent received notice of at least seven. For four of the nine listings, respondent was actually subpoenaed and still refused to appear. Moreover, the record contains notice to respondent of the hearings held on October 17, 1985, and October 23, 1985. Such notice was sent to re-

spondent at his actual and registered office by registered mail with a return receipt requested. The return receipt reflects by signature the delivery of the notice on September 20, 1985. In light of the circumstances, we must conclude that the reasons asserted by respondent for a reopening of the record have no validity. We are convinced on this record that respondent has been afforded the full and fair *opportunity* to develop, participate and present a defense to these charges. We therefore deny respondent's belated request to reopen the record.

## RESPONDENT'S EXCEPTIONS TO REPORT FINDINGS AND RECOMMENDATIONS OF COMMITTEE [   ]

By letter dated September 2, 1986, 55 days after filing of the hearing committee report, respondent submitted exceptions to the hearing committee's findings and recommendations. These exceptions assert the following: (1) the removal of hearing committee chairman [D] on allegations that Chairman [D] has been an "avowed enemy of respondent" since 1979; (2) alleged collusive activity between disciplinary counsel and hearing committee Chairman [D] in the scheduling process which had the effect of depriving respondent of an opportunity to be fully and fairly heard; (3) exceptions to findings of fact concerning the [A] charge asserting "facts" which are *not* in the record to the effect that [A] had an intimate relationship with respondent during the period in question which was terminated by respondent, motivating a spiteful and untrue claim; and (4) exceptions to findings of fact concerning the [C] charge asserting that such findings are "categorically denied and are totally untrue" and

would be disproved if respondent were permitted to do so. Respondent concludes his exceptions by stating that "due to illness respondent was forced to terminate his exceptions at this point and thus reserves his right to complete this pleading."

Disciplinary board rule 89.201(c) provides:

"(c) *Procedure to except to report of hearing committee.* Any participant desiring to object to the findings and recommendations of a hearing committee shall, within 20 days after the service of a copy of a report or such other time as may be fixed by the board chairman, file exceptions to the report or part thereof in a brief (designated 'brief on exceptions'). 'Briefs opposing exceptions' may be filed in response to briefs on exceptions within 20 days after the filing of briefs on exceptions or such other time as may be fixed by the board chairman. No further responses will be entertained unless the board, with or without motion, so orders." (emphasis added).

Although these exceptions cannot be considered because of their untimeliness, we do make the following comment. The request for removal of Chairman [D] and the setting aside of all recommendations and findings in which he participated is grounded on information which respondent says that he has had since *1979*. No request was made for the chairman's removal until after the hearing committee filed its report. Moreover, as will be discussed more fully hereafter, the evidence submitted by disciplinary counsel fully supports the findings made by the hearing committee. Also, the record reflects a chairman that examined petitioner's witnesses and evidence with a special degree of care in an attempt to assure the fairness of a proceeding without respondent's presence. With respect to collusion in the scheduling process, our review of the

history of these proceedings shows that respondent had repeated opportunities to appear and present his defense. Finally, the exceptions to the findings of fact that pertain to the [A] and [C] charges constitute, at most, naked assertions of what respondent *might* have proved had *he* not forfeited his right to do so. As such, these exceptions have no record support even if we felt at liberty, under the rules, to consider them.

## SUMMARY OF THE EVIDENCE

Charge I concerned respondent's representation of [A] ([C]) in her claim against [B] Inc., which had been settled by respondent, who uttered a forged release and settlement draft in connection therewith. [A] testified that, on May 5, 1980, she was injured as a result of a fall at a [G] Steak House owned by [B] Inc. In June 1980, [A] retained respondent to represent her with respect to her claim arising out of the aforesaid accident. Respondent litigated the case before an arbitration panel in the United States District Court for the [   ] District of Pennsylvania. Award was entered against [A] and was timely appealed. Thereafter respondent obtained the authority from [A] to accept a settlement offer in the amount of $4,500. By letter dated October 1, 1981, [H], counsel for [B's] insurer, sent a release for [A's] signature, bearing the caption "Release of All Claims" to respondent stating that a draft would be issued upon receipt of the executed release. By letter dated October 5, 1981, respondent forwarded to [H] a settlement release bearing he caption "Know All Men By These Presents" bearing the purported signature of [A]. [A] testified that this release had not been signed by her or with her authorization or

knowledge. On October 16, 1981, respondent caused to be picked up from [H's] office, the settlement draft in the amount of $4,500 payable to [A] and [respondent]. Respondent caused to be endorsed the name of "[A] (sic)" to the back of the settlement draft without the knowledge and consent of [A] and deposited the draft into his attorney-at-law account at the [I] Bank. [J], a certified document analyst, provided expert testimony as to the forgery of the signatures of [A] on the release submitted to the insurer and the settlement draft. Subsequent to the deposit of the settlement draft into respondent's account, the balance in the account fell below the amount necessary to make distribution to [A]. The disbursements from this account which resulted in the insufficient balance were made for respondent's own use and benefit or the benefit of others but not for the benefit of [A]. These disbursements were made without the knowledge and consent of [A]. On November 13, 1981, respondent forwarded to [A] for her signature the settlement release captioned "Release of All Claims" who executed the same and promptly returned it to respondent. The release actually signed by [A] was never submitted to [H] or to [B's] insurer. In March 1982, not having heard from respondent concerning settlement proceeds, [A] retained [K] to communicate with respondent concering her funds. [K] spoke to respondent concerning this matter and, by letter dated March 26, 1982, respondent represented to [K] that respondent and [A] had personally picked up the settlement draft, endorsed it and deposited the draft into respondent's escrow account on October 16, 1981. These representations made by respondent were false. Thereafter, respondent engaged in a series of delay tactics in response to [K's] demands for distri-

bution of the settlement proceeds. By letter dated March 31, 1982, to respondent, Pennsylvania Blue Shield advised of its subrogation claim in the amount of $158 and requested that respondent represent its interests. On April 12, 1982, [A] executed the settlement sheet prepared by [K] reflecting expenses totalling $842 to be paid by her from the net amount of $2,925 due to her. On April 15, 1982, [K] forwarded to respondent the aforesaid settlement sheet and demanded that he remit the net proceeds to [A] in accordance with the settlement sheet. On May 12, 1982, respondent advised [K] that he would transmit the net proceeds check immediately if [A] agreed to deduct the Blue Shield and physician's bills from the sums stated to be due her on the settlement sheet prepared by [K]. On May 14, 1982, respondent was notified that [A] consented to payment or escrow of funds allegedly due to Blue Shield. On June 14, 1982, [K] transmitted to respondent a revised settlement sheet duly executed by [A] agreeing to accept the net amount of $2,272. On June 25, 1982, respondent notified Blue Shield and Blue Cross that [A] was disputing their subrogated claims, although [A] never asked respondent to contest these claims. On July 12, 1982, [A] agreed to accept the check in the amount of $2,272, less the $158 disputed claim of Blue Shield. Respondent continued to delay distribution of the settlement proceeds. Finally, by letter dated December 28, 1982, respondent was notified of the complaint of [A] to petitioner herein concerning this matter. (P-26). On or about January 24, 1982, respondent issued a check in the amount of $2,120 and transmitted the same to [K] by letter in which he falsely implied that he had sent a check for the proceeds to [A] the previous summer.

As to charge II, respondent exhibited a similar patern of deceptive, dishonest conduct in his representation of the estate of [C], deceased. He utilized his position of authority to convince the heirs that the role of administrator would be too difficult for one of them to assume and that he would assume all of the responsibilities involved in handling the estate. He offered purportedly reduced fees for extensive services finally agreeing to accept a total fee of 9 percent of the estate value for handling all matters related to the affairs of decedent. Respondent then inflated the basis on which the fee would be calculated by filing an inventory including entireties property, not properly includable in the probate estate. When questioned by [L] as to the propriety of this inclusion, respondent assured him of its necessity, accused him of attempting to cheat respondent out of his rightfully due fee and implied that he had benefited the heirs by stating fraudulently reduced value for certain assets. Thereafter, respondent filed an amended inventory correctly deleting these properties. However, he did not reveal the deletion to the heirs, nor did he reduce the fee charge. The testimony of [L] established that respondent repeatedly sought to obtain additional compensation to perform services that he had already agreed to perform as part of his duties in the estate, and that he failed to carry out those services despite [M's] repeated requests and his representations that he was so doing. Finally, he issued an inflated bill for services which should have been included in the estate fee.

In actions which facially appear to be of benefit to the estate, respondent contested the inclusion in the estate for tax purposes the vehicle transferred by decedent to [L]. However, as the transfer took

place within two years prior to death, it was clearly includable (Pennsylvania Inheritance and Estate Tax Act of 1961, §222). He failed to file necessary appeals in a timely manner and then attempted to cover up his neglect by forwarding to the Department of Revenue copies of back dated letters he contended he had sent earlier.

Testimony showed that respondent's mishandling of the estate was not limited to neglect, deception and indirect efforts to avoid ligitimate obligations. He actively misrepresented to the [Ms] the financial status of the estate, while withholding the documentation necessary to the accurate evaluation of his accounts, "despite the repeated requests." Counsel presented the testimony of [N], investigator, who analyzed bank records pertaining to the [C] estate. Those records revealed that within four months of having opened the estate checking account, respondent had withdrawn $5,529, in excess of the $4,701.69 in fees and commissions and $439.15 in expenses claimed by him. Thereafter, he made various deposits to and withdrawals from the estate bank accounts, of which records were not fully maintained. Giving respondent credit for the undocumented deposits, fees based on the inflated inventory and unsubstantiated expenses, $4,965.16 in estate funds were spent for respondent's benefit or for purposes unrelated to the estate. This conversion of estate assets was achieved by deception and without the knowledge or consent of the heirs. Many requests were made by the [Ms] for the full accounting regarding estate funds. Respondent has never fully accounted to the [Ms] in this regard. During the investigation stage of this complaint, a subpoena was issued to respondent for his records of the estate. In response thereto, on February 22,

1984, respondent provided the petitioner what he *purported* to be all records of the estate, including certain bank records. Respondent failed to include 11 checks, five of which were payable to respondent or paid on respondent's account and had no corresponding check stub. With respect to estate funds, in summary, respondent has disbursed to himself or on his own behalf, or failed to account for, at least $4,965.16 of estate funds in excess of his claimed commissions and costs and has failed to account for a total of $1,983 in deposits and $2,740 in withdrawals from estate bank accounts.

## FINDINGS OF FACT

The disciplinary board of the Supreme Court of Pennsylvania hereby adopts the following findings of fact of the hearing committee.

*Charge I — [A]*

(1) On May 5, 1980, [A] was injured as a result of a fall at a [G] Steak House, owned by [B] Inc.

(2) In or about June 1980, [A] retained respondent to represent her with respect to her claims arising out of the aforesaid accident.

(3) On June 28, 1980, [A] executed a retainer agreement prepared by respondent in which she agreed to pay him a contingent fee of 35 percent of any recovery obtained by him in connection with said claims.

(4) Respondent brought suit on complainant's behalf in the United States District Court for the [      ] District of Pennsylvania at Civil Action No. [      ].

(5) An arbitration award finding against [A] was entered and respondent filed an appeal thereof.

(6) Thereafter, counsel for [O], [B's] insurer, made a settlement offer in the amount of $4,500.

(7) Respondent conveyed the offer to [A] and she advised him that she accepted it.

(8) By letter dated October 1, 1982, [H], counsel for [O], confirmed the settlement offer, enclosed a release for [A's] signature bearing the caption "Release of All Claims," and stated that a draft would be issued upon receipt of the executed release.

(9) By letter dated October 5, 1981, respondent sent to [H] a settlement release dated October 5, 1981 bearing the caption "Know All Men By These Presents."

(10) The release bore an endorsement in the name of [A].

(11) The release had not been signed by her or with her authorization or knowledge.

(12) Respondent falsely represented to [H] that the release had been signed by [A].

(13) The aforesaid representation was known by respondent to be false.

(14) By letter dated October 15, 1981, respondent advised [H] that he would appear in [H's] office to pick up the settlement draft.

(15) On October 16, 1981, upon receipt of respondent's letter of October 15, [H] telephoned respondent who stated that he would personally stop by [H's] office later that day to pick up [A's] check.

(16) On October 16, 1981, respondent or someone from his office picked up at [H's] office a letter dated October 16 written by [H], enclosing a settlement draft issued by [O] ([        ]) dated October 14, 1981, in the amount of $4,500 payable to [A] and [respondent].

(17) Respondent failed to advise [A] promptly of his receipt of her funds.

(18) Respondent caused to be endorsed the name of "[A] [sic]" to the back of the aforesaid draft, without the knowledge or consent of [A].

(19) Respondent also caused to be placed thereon a stamp "For Deposit Only, [respondent], Escrow Account," followed by an account number which had been crossed out.

(20) On October 16, 1981, respondent deposited the aforesaid draft into his attorney-at-law account no. 01205673 at the [I] Bank.

(21) Subsequent to the deposit of the settlement draft in the amount of $4,500 into respondent's attorney-at-law account, the balance in the account fell below the amount necessary to make distribution to [A].

(22) The disbursements from the account which resulted in the insufficient balance therein were made for respondent's own use and benefit or the benefit of others, but not for the benefit of [A].

(23) The aforesaid disbursements were made without the knowledge or consent of [A].

(24) At and subsequent to the time of deposit of [A's] $4,500, respondent deposited into his attorney-at-law account funds other than client escrow funds.

(25) By letter dated November 13, 1981, respondent forwarded to [A] for her signature the settlement release captioned "Release of Claims" which he had received from [H].

(26) [A] executed the aforesaid release and promptly returned it to respondent.

(27) Respondent did not submit the release actually signed by [A] to [H] or to [O].

(28) Respondent did not thereafter notify [A] that he had received the settlement draft in connection with her claim against [B] Inc., and did not distribute to her the share of the proceeds due to her, until after intervention by her counsel and petitioner.

(29) In or about March 1982, [A] retained [K] to communicate with respondent concerning her funds. [K] telephoned respondent and informed him that he was aware that [A] had signed a release and that a draft had been negotiated. [K] demanded release to [A] of her share of the settlement funds.

(30) By letter dated March 26, 1982, respondent stated to [K], inter alia, that:

"(a) He and [A] had personally picked up the settlement draft on October 16, 1981, at [H's] office.

"(b) She had endorsed the draft at approximately 4:58 p.m. but that it was too late to deposit the draft into his escrow account at [I] Bank at that time.

"(c) Both his personal and escrow bank accounts were 'very healthy' and would cover [A's] share of the settlement draft."

(31) Respondent's statements in paragraph 30 (a) and (b) above were false.

(32) Under cover of the March 26, 1982, letter, respondent also provided a settlement sheet for [A's] signature, reflecting a net amount due her of $2,093.

(33) Thereafter, negotiations and correspondence ensued between respondent and [K], in which [K] advised respondent that [A] denied having endorsed the check and repeatedly demanded that respondent release to [A] her share of the settlement funds.

(34) Respondent repeatedly promised [K] he would forward to him the funds due to [A] but subsequently failed to do so.

(35) By letter dated March 31, 1982, to respondent, Pennsylvania Blue Shield advised of its subrogation claim in the amount of $158 and requested that respondent represent its interests.

(36) On April 12, 1982, [A] executed a settlement sheet prepared by [K] reflecting expenses totalling $842 to be paid by her from the net amount of $2,925 due to her.

(37) By letter dated April 15, 1982, [K] forwarded to respondent the aforesaid settlement sheet and demanded that respondent forward to [A] the funds due to her.

(38) By letter to [K] dated April 26, 1982, respondent promised to "dispose of this matter" after April 29.

(39) By letter to [K] dated May 12, 1982, respondent stated that if [A] agreed to deduct the Blue Shield and physician's bills, he would prepare his draft immediately for the balance.

(40) By letter dated May 14, 1982, [K] notified respondent that [A] consented to payment or escrow of funds allegedly due to Blue Shield and transmitted to respondent a revised settlement sheet, duly executed by [A] on June 14, 1982, whereby she agreed to permit respondent to pay various bills and expenses totaling $642 from the funds in his possession and to accept a net amount of $2,272.

(41) Despite [K's] transmittal of the revised settlement sheet and respondent's promise to do so, respondent did not thereafter forward [A's] share of the settlement proceeds to her.

(42) By letters dated June 14 and July 30, 1982, respondent was notified by Pennsylvania Blue Shield of its subrogation interest in [A's] case in the amount of $158 and was invited to represent Blue Shield in collecting this amount for a specified fee.

(43) By letters dated June 25, 1982, respondent wrote to Pennsylvania Blue Shield and Pennsylvania Blue Cross and stated that [A] was disputing their subrogation claims, and requested proof of payment of bills; he sent copies to [K].

(44) [A] never asked respondent to contest this claim.

(45) By letter dated July 12, 1982, [K] acknowledged receipt of copies of respondent's letters to Blue Shield and demanded that respondent forward to [A] a check "in the agreed amount" [$2,272] less the $158 disputed claim of Blue Shield, with the understanding that if the claim were not subsequently paid, the $158 would be forwarded to [A].

(46) Despite respondent's promise to make distribution upon receipt of [A's] agreement to said disbursements, respondent did not send [A] her funds.

(47) Another letter from Blue Shield with respect to subrogation was sent to respondent on or about July 30, 1982.

(48) By letter dated August 19, 1982, to Blue Shield, respondent accepted representation of their subrogated interests in [A's] claim.

(49) Receipt of respondent's August 19 letter was confirmed by Blue Shield on or about August 24, 1982.

(50) By letter dated December 28, 1982, respondent was put on notice of the complaint of [A] to pe-

titioner concerning the matters set forth in paragraphs 1-49 hereinabove.

(51) On January 5, 1983, respondent opened a new account at the [P] Bank, no. 0040-5-2552.

(52) On January 6, 1983, respondent deposited $6,000 into that account.

(53) On January 10, 1983, respondent opened account no. 51530111-4 at [P] Bank.

(54) On January 10, 1983, respondent transferred $5,000 from the first account to the second account.

(55) On or about January 24, 1983, respondent issued a check in the amount of $2,120 payable to [A], drawn on account no. 51530111-4 (the second account) at [P] Bank.

(56) Respondent transmitted said check to [K] under cover of a letter dated January 24, 1983, in which he falsely implied that he had sent a check for the proceeds to [A] during the previous summer (1982).

(57) Respondent failed to maintain records of his transactions with [A's] funds.

*Charge II — Estate of [C]*

(58) On October 13, 1978, [C], a resident of [     ], died intestate. Surviving him were his widow, [M], and three adult children, [L], [Q] and [R].

(59) Decedent left an estate which included two bank accounts, an automobile, stocks and bonds, and household furnishings. At the time of his death, he also held by the entireties with his wife certain real properties.

(60) In or about November 1978, respondent was retained by [L], son of decedent, and the other heirs of [C] to administer and to act as counsel for the estate.

(61) Respondent also agreed to obtain information and to resolve issues about certain obligations outstanding with respect to the entireties properties, without additional charge to the [M].

(62) At respondent's request the [M] gave respondent the deeds to the real estate.

(63) At respondent's suggestion, each of the heirs renounced his right to act as administrator of the estate, in favor of respondent.

(64) Letters of administration were issued to respondent on November 13, 1978, by the register of wills of [     ] County at administration no. [     ] of 1978.

(65) During the period in which respondent has administered and represented the estate; he has relocated his office on numerous occasions, without notice to the beneficiaries.

(66) During the period of respondent's representation of the estate, he repeatedly attempted to change the fee agreement relating to his services, first agreeing to perform services without compensation for which he later attempted to charge fees in addition to those agreed upon by the [M] for his services as administrator and counsel to the estate.

(67) By letter of November 27, 1978, respondent advised the [M] of the services he intended to perform for the estate.

(68) Subsequent to his appointment as administrator respondent obtained the proceeds of decedent's bank accounts and other assets.

(69) On or about December 6, 1978, respondent opened an estate checking account, no. 0151-7183, at [I] Bank by depositing therein $27,853.20, the proceeds of decedent's accounts at [S] Bank.

(70) On or about January 19, 1979, respondent opened an estate savings account, no. 01-215780-1, at [T] Bank (now [     ]), by depositing therein $20,000 withdrawn from the estate checking account.

(71) After opening the estate checking account, on various occasions, respondent wrote checks thereon to pay creditors of the estate and to himself or for his own benefit, as set forth hereinbelow.

(72) Respondent withdrew funds from the estate savings account to pay creditors of the estate and to himself or for his own benefit.

(73) Respondent commingled in the estate savings and check accounts funds of his own and funds from sources not attributable to the estate.

(74) In or about January 1979, respondent advertised the grant of letters of administration.

(75) Respondent failed to file an inventory of the estate within the three-month period then specified by the Probate, Estates and Fiduciaries Code, 20 Pa.C.S. §3301.

(76) Under cover of letter dated February 5, 1979, respondent sent to the [M] a statement of work completed on the estate, which included work relating to the entireties properties.

(77) On or about March 12, 1979, respondent filed an inventory of the estate, listing personal property valued at $32,741.75 and real estate valued at $19,600.

(78) Respondent included in the inventory of estate assets entireties properties which were not subject to tax in order to increase the total assets of the estate, respondent's fee being a percentage thereof.

(79) Respondent falsely represented to the [M] that entireties properties had to be included in the inventory of estate assets.

(80) On March 12, 1979, respondent filed a Pennsylvania state inheritance tax return for the estate.

(81) By telephone call and by letter dated March 12, 1979, respondent advised [M] that he had completed "most of the transactions necessary for the settlement of the above estate." He further stated that certains steps had to be taken before disbursements could be made but he would do so "ahead of schedule."

· (82) By letter dated March 12, 1979, to [M], respondent advised that the estate would be distributed within 15 days.

(83) On March 23, 1979, respondent filed a corrected inventory on which he correctly reflected the total assets as personal property only.

(84) By letter dated March 23, 1979, respondent advised the [M] of a meeting to discuss the progress in settling the estate.

(85) On or about March 27, 1979, respondent held a scheduled meeting with the beneficiaries to discuss the estate.

(86) Under cover of a letter dated March 30, 1979, respondent sent to the beneficiaries what he identified in the letter as a "statement reflecting expenditures by the above estate," dated March 30, 1979.

(87) This statement contained inaccuracies, including the following.

(a) He failed to list in said statement payments to himself prior to March 30, 1979, totaling $5,529.

(b) He advised the beneficiaries his total fee and commissions would be $4,701.69.

(c) He listed payment to the insurance placement facility in the amount of $140, but only $90 had been paid.

(d) He listed payments for real estate valuations in the amount of $80 but only $70 had been paid.

(e) He listed $85 as initial expenditures by him but failed to show a payment to himself of $400 for legal expenses.

(f) He failed to reflect a total of $1,738.87 in deposits into the estate accounts.

(g) He showed a balance in the estate of $25,824.86, but the total balance in the estate checking and savings accounts as of March 30, 1979, was $22,179.93.

(88) At the time that respondent prepared the aforesaid statement of March 30, 1979, he knew that his failure to reflect the $5,529 in payments to himself constituted a material inaccuracy.

(89) The [M] did not request respondent to make early distribution of the estate.

(90) On several occasions, the [M] asked respondent to see the original financial records of the estate, but respondent did not permit them to do so.

(91) By letter dated April 18, 1979, respondent advised [M], inter alia, that he would make distribution of "advances on the distributive shares" totalling $17,000 on April 26 or April 30 and that he

would hold $2,500 in reserve for taxes and $1,000 as "General Reserve and Miscellaneous [sic]."

(92) Respondent listed in the aforesaid letter as payable or paid to respondent the amount of $3,122.51 for attorney's fee and $1,561.25 as administrator's fee, representing respectively 6 percent and 3 percent of the gross estate, including nonestate entireties properties.

(93) On or about April 30, 1979, respondent held a meeting with the heirs at which he made disbursement from the estate savings account of a total of $17,000 of the estate proceeds to the beneficiaries, specifically $3,778 to each child and $5,666 to [M].

(94) At the meeting, respondent showed to the heirs a document similar to a "receipt and release" and an accounting which purported to reflect assets and expenses of the estate.

(95) At respondent's request, the beneficiaries executed the release.

(96) Respondent promised to provide copies of said documents to them thereafter but he failed to do so, despite requests therefor.

(97) Thereafter, the [M] contacted respondent on several occasions concerning problems with delinquent real estate water and sewer bills and sheriff's sale notices.

(98) Respondent refused to handle these problems without a separate retainer, despite having agreed to do so without charge.

(99) On August 27, 1979, an inheritance tax appraisement in the amount of 41,282.89 was sent to respondent.

(100) On or about November 27, 1979, respondent made a payment on account of the inheritance tax in the amount of $500.

(101) Respondent failed to pay the remainder of tax due or to appeal the assessment in a timely manner as a result of which interest continued to accumulate.

(102) Between May 1979 and January 1980, [L] attempted to reach respondent by telelphone on many occasions but respondent failed to return his calls.

(103) Under cover of a letter to the [M] dated January 14, 1980, in which respondent promised that they "can expect to soon hear from me," respondent forwarded a "statement of expenditures" for the period March 30, 1979, to January 25, 1980.

(104) The statement was incomplete and inaccurate, in that:

(a) Respondent listed mortgage payments to [U] Federal Savings in the amount of $455.42; actual payments were $539.35.

(b) Respondent listed payments to [V] of $464.16; no payments had been made to her as of January 25, 1980.

(c) Respondent listed disbursements to himself totaling $4,857.96 for fees, commissions and expenses; actual payments to him or on his behalf totaled at least $5,529.

(d) Respondent failed to account for the disposition of $1,075 disbursed from the estate savings account and the source of $1,408 deposited therein, from respondent's own account.

(e) Respondent showed a balance in the estate of $1,401.04; the total of the estate checking and saving accounts was at the time $1,477.41, including the deposit of $1,408 from respondent's account.

(f) Respondent listed as expenses certain court costs for matters unrelated to the estate, for which no records or documentation were supplied to the beneficiaries and which do not appear to have been paid from either estate bank account.

(g) Respondent listed a payment of $401.60 to "[W]," which is not reflected in either estate bank account.

(105) On April 7, 1980, respondent filed with the Pennsylvania Department of Revenue a protest of inheritance tax appraisement, which protest was out of time and related to a claim which was unwarranted under existing law.

(106) By letter dated April 16, 1980, respondent was notified by the Department of Revenue of the denial of the petition as untimely filed.

(107) By letter dated April 21, 1980, respondent sent to the Department of Revenue purported copies of letters to that department dated November 27 and November 30, 1979, the originals of which had never been received by that department.

(108) In so doing, respondent fraudulent attempted to cure the untimeliness of his protest by attempting to toll the filing time at an earlier date.

(109) Respondent was unsuccessful in that the appropriate filing date was October 22, not November 22, 1979.

(110) Respondent was so notified by letter from the Department of Revenue dated May 5, 1980.

(111) Despite being advised of the denial of the appeal, respondent failed to pay the remaining taxes due on the estate.

(112) As a result, the outstanding balance continued to accrue interest.

(113) Respondent advised the [M] that he was taking care of paying inheritance tax.

(114) Respondent issued a statement to the [M] purporting to cover the period from January 25, 1980, to April 25, 1980.

(a) The statement shows a "balance on account" of $6,018.15, after payment of $782.89 inheritance tax due.

(b) This was inaccurate and misleading, in that the actual bank balances at the time totaled $201.29 and the inheritance tax had not been paid.

(c) Respondent knew that the foregoing statements were false.

(115) Commencing in the spring of 1980, [L], on behalf of all of the heirs, made numerous requests that respondent complete the administration of the estate, supply a complete audit, provide deeds to the properties, finalize the inheritance tax return and make final distribution.

(116) Respondent failed to comply with these requests.

(117) After subsequent correspondence and communications, in the spring of 1980, respondent wrote to the [M] and advised that the last balance in the statement of expenditures should be "an additional $300 plus." Respondent also stated, "I plan to have the estate closed out by November 13, 1980."

(118) Thereafter, respondent advised [L] that the estate was in the process of being closed.

(119) By letter dated January 12, 1981, to [L] respondent stated that "closing the estate is my responsibility." Respondent further stated, "Presently, there is approximately $918.15 as liquid cash in the estate, and an outstanding bill of some $1,200. . . ."

(a) The foregoing statement was false, in that, at that date, the total balance in the two estate bank accounts was $20.94.

(b) At the time respondent made these statements, he knew they were false.

(120) By letter dated January 16, 1981, [L] asked for originals of copies of all records and documents concerning the estate and a corrected accounting statement.

(121) By letter dated January 22, 1981, respondent stated, inter alia, that, "I will compile a list of receipts for your own viewing. . . ."

(122) Respondent failed to carry out this promise or to provide the complete records requested by [L].

(123) By letter dated July 22, 1981, respondent stated, "I wanted you to know I intend to submit a final accounting to the office of the register of wills . . . letters of administration were granted on November 13, 1978, hence, no claims including tax claims can be made against the estate after this date."

(124) The foregoing statement as to claims was inaccurate in that claims filed against the estate within one year of advertisement toll the statute and claims not filed are barred after that time. (Probate, Estates and Fiduciaries Code, Pa.C.S. §§3383, 3385).

(125) Respondent failed to submit a final accounting to the register of wills, the orphans' court, or the beneficiaries, as he promised to do.

(126) By letter dated January 28, 1982, [L] again requested that respondent respond to the family's inquiries and that he send him the following records: original deeds, corrected audit and cancelled checks, information relating to decedent's tax returns. He further advised respondent that upon receipt thereof "we would like to terminate our relationship with you. . . ."

(127) Respondent failed to send the documents requested or to complete the work necessary to close the estate, as required of him as personal representative.

(128) By letter dated February 18, 1982, to [M], respondent scheduled a meeting concerning the estate for March 15, 1982.

(129) The date was confirmed by the [M], but on the evening of March 15, respondent cancelled the meeting.

(130) By letter dated March 15, 1982, [L] complained of the cancellation and requested documentation concerning taxes and a meeting with respondent.

(131) Respondent failed to provide documentation as requested, to reschedule the meeting at a mutually convenient time, or to carry out his promises concerning the completion of the estate.

(132) On several occasions, respondent scheduled meetings with the [M's] but cancelled them without notice, causing the [M's] to lose time from work.

(133) By letter to [L] dated May 6, 1982, respondent advised that he had scheduled a meeting concerning real estate taxes.

(134) Respondent failed to advise [L] thereafter of the results of the meeting, as promised.

(135) By letter dated September 22, 1982, to [L], respondent promised additional action with respect to the real estate.

(136) By letter dated December 15, 1982, [L] asked respondent to send deeds to all of [M's] properties and to close the estate by January 15, 1983.

(137) By letter dated February 28, 1983, [L] made a similar request and offered to pick up the deeds.

(138) Respondent failed to respond or to release the deeds.

(139) Respondent further requested payment of a fire insurance premium in the amount of $49, which was paid to respondent by [L].

(140) The funds were forwarded by respondent to the [X].

(141) The policy was eventually cancelled, and a $36 refund was returned to respondent in or about February 1983.

(142) Respondent failed to forward the refund until in or about March or April 1983, when he sent [L] a check written on a nonestate account.

(143) In or about June 1983, [L] attempted to negotiate the check, which was rejected due to insufficient funds in the account.

(144) [L] returned the check to respondent and demanded reimbursement.

(145) Respondent promised to make restitution to [L], but failed to do so.

(146) By letter dated June 6, 1983, respondent sent to [L] a description of various services allegedly performed by respondent which respondent stated were unrelated to the estate and for which he advised of a bill of $7,575, which includes services relating to the entireties properties, which services respondent had previously stated would be included in the fee for administering the estate and the value of which properties had been included in the gross estate for purposes of calculating the counsel fee and administrator's commission.

(147) Under cover of a letter dated June 17, 1983, respondent sent [L] an itemization of estate checks issued and a bill for $7,525 dated 6/15/83 for those services set forth in the June 6 letter.

(148) On various occasions, [L] called respondent at telephone numbers respondent gave him and requested that respondent send an audit of estate funds, but respondent did not do so.

(149) Under cover of a letter dated June 17, 1983, respondent sent to [L] what he represented to be "the audit of your father's estate, a copy of which you already have." Respondent further stated "just a few expenditures are missing."

(150) This "audit" was incomplete and inaccurate, in that:

(a) Respondent failed to list in said "audit" various checks issued on the estate checking acount, payable to himself, on his behalf, or to unknown payees, in a total amount of $2,800.

(b) Respondent included in said "audit" an expense paid to "[V];; [      ], a check issued on her

behalf dated August 23, 1979, in the amount of $400, but failed to reveal that it had never been honored by the bank.

(c) Respondent failed to account for the source of $975 in deposits into the estate checking account.

(d) Respondent failed to account for transactions relating to the estate savings account at [T] Bank, including deposits in the total amount of $16,048 and disbursements totalling $2,735.

(151) As a result of a complaint brought by [L] to petitioner regarding respondent's handling of the estate, inquiries were made of respondent and a subpoena was issued for his records of the estate.

(152) In response thereto, on February 22, 1984, respondent provided to petitioner what he purported to be all records of the estate, including certain bank records.

(153) Although respondent provided bank statements and certain checks and check stubs for the estate checking account, [I] Bank account no. 0151-7183, respondent failed to include 11 checks, five of which were payable to respondent or paid on respondent's account and had no corresponding check stub.

(154) Under cover of a letter to petitioner dated February 28, 1984, respondent provided a photocopied, two-page document purporting to be "the family agreement, signed, sealed and delivered on April 30, 1979. . . ."

(155) One page of the document is a "general release" of respondent and sets forth various agreements and undertakings of the [M's] which improperly placed responsibility on them for payments

which should have been made by respondent from the proceeds of the estate.

(156) The documents supplied by respondent with his letter dated February 28, 1984, were not those originally shown to, approved by, and signed by the beneficiaries.

(157) Respondent told the [M's] that he had to maintain open bank accounts to pay the inheritance tax and complete the administration of the estate.

(158) Respondent failed to carry out these obligations.

(159) Respondent's submission to petitioner of the foregoing release was intended to mislead petitioner to the effect that the [M] had agreed to assume outstanding obligations of the estate and to permit respondent to keep estate bank accounts open without final accounting of the funds therein.

(160) The other page of the document submitted to petitioner with his letter of February 28, 1984, is an accounting dated April 30, 1979, which was not the accounting supplied to the [M] at the time of distribution.

(161) The aforesaid "accounting" is inaccurate and/or misleading as set forth hereinbelow.

(a) Respondent listed as expenses items which are not reflected in the estate checkbook or in other estate records.

(b) Respondent listed payments of $455.42 to [U] Federal Savings and Loan, when actual payments as of that date were $529.35.

(c) Respondent failed to list as an asset the $300 in U.S. government bonds included in the inventory and distributed directly to the beneficiary.

(d) Respondent failed to list an expenditure of $34.25 to [Y] Inc.

(e) Respondent listed as an expense $500 for "agreed upon inheritance tax payment" which had not been made as of April 1979, and was not made until in or around November 1979.

(f) Respondent listed initial expenses of $174.20, although he received $400 in reimbursement for such expenditures.

(g) Respondent listed as an expense $464.16 "[V] — referral approved by [L]." No such expense was properly payable from estate funds or approved by the [M]. The only payments actually made by respondents from estate funds to or on behalf of [V] were a check dated August 23, 1979, to the [Z] Employees Credit Union in the amount of $400, which was returned due to insufficient funds, and one in the amount of $80 paid to [V] on or about August 13, 1979.

(h) Respondent listed "reserve for post-settlement matters" in the amount of $3,576.80, after payment of the $500 referred to in paragraph 161(c) above, which was inaccurate, in that the balance in the estate savings account as of April 30, 1979, was $4,680.83 and in the checking account was $291.01, totalling $4,971.84.

(i) Respondent stated he had taken fees and commissions of $4,683.76, when in fact payments to him as of that date totalled $5,129, exclusive of expenses.

(162) None of the statements provided by respondent reflected a check dated August 21, 1979, in the amount of $500 payable to [AA] Associates for respondent's rent.

(163) Respondent has disbursed to himself or on his own behalf, or failed to account for at least $4,965.16 of estate funds in excess of his claimed administrator's commission and executor's fee and alleged costs.

(164) Respondent has failed to account for a total of $1,983 in deposits and $2,740 in withdrawals from estate bank accounts.

(165) Respondent has never fully accounted to the [M] for estate funds or permitted them to see original records in spite of his duty to do so as personal representative of the estate and many requests by them that he do so.

*Conduct During Hearing Committee Proceedings*

(166) Respondent failed to participate in this disciplinary proceeding, failed to cooperate with petitioner and the hearing committee, failed to appear for pre-hearing conferences and hearings in this proceeding after being given notice of such conferences and hearings, and failed to respond to any attempts by petitioner to communicate with respondent for the purpose of scheduling a conference or hearing at a mutually convenient time. Said failure of respondent was willful and reflected a contemptuous attitude toward the hearing committee and the disciplinary system.

(167) Respondent failed to show any circumstances or cause which would exclude respondent's failure to participate in his proceeding and his failure to cooperate with petitioner and the hearing committee as set forth in the foregoing paragraph.

288

## DISCUSSION AND CONCLUSIONS OF LAW

Evidence is sufficient to prove ethical misconduct if a preponderance of that evidence establishes the charged violation and the proof is clear and satisfactory. *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 217 (1982). Petitioner is not required to establish misconduct through direct evidence and can prove its case solely by circumstantial evidence. *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981). Given these standards, the board undertakes a de novo review and makes its own evaluation as to whether or not the evidence presented before the hearing committee supports the charges asserted. *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981). In this case, in view of the absence of respondent at the hearing, we have carefully scrutinized not only the testimony of complainant but especially the documentary evidence presented to the hearing committee. We have adopted the hearing committee's findings of fact and now apply those findings to the law of disciplinary infractions as codified and interpreted by the Supreme Court of Pennsylvania.

As to charge I, respondent's conduct in submitting to [B's] insurer a release bearing a forged signature, in negotiating the draft over a forged endorsement, in commingling and converting the proceeds for his own benefit, violates disciplinary rules 1-102(A)(3), (4) and (6); 9-102(B)(1) and (4). DR 1-102(A)(3) prohibits an attorney from engaging in illegal conduct involving moral turpitude. DR 1-102(A)(4) prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. 18 Pa.C.S. §4101(A)(2) and (3) makes the knowledgeable uttering of forged instru-

ments illegal conduct. Circumstances surrounding the execution and endorsement of the [A] release and the proceeds check clearly support the proposition that respondent had to know that these instruments were forged. His transmittal of the same and representations to defense counsel in connection with these instruments was dishonest and involved moral turpitude thereby constituting violations of DR 1-102(A)(3) and (4). Obviously, such conduct reflects adversely on respondent's fitness to practice law in violation of DR 1-102(A)(6). Respondent's conduct in converting [A's] funds is also illegal conduct which involves moral turpitude and his conduct with respect to misrepresentations he made to complainant's successor counsel regarding his handling of the settlement proceeds involved dishonesty and also reflected adversely on his fitness to practice law.

DR 9-102(A) prohibits commingling. On October 16, 1981, respondent deposited a settlement proceeds check from the [A] claim into his own attorney-at-law account and also deposited cash into the account, all in violation of DR 9-102(A). DR 9-102(B)(1) requires an attorney to promptly notify a client of the receipt of client's funds, and DR 9-102(B)(4) requires the attorney to *promptly* pay or deliver such funds to the client. In this case, respondent received [A's] settlement funds on October 16, 1981, and did not notify [A] of such receipt until March 26, 1982, after she had obtained another attorney. Moreover, respondent did not transmit any of such proceeds to [A] until January 24, 1983, 15 months after his receipt. His conduct clearly violates DR 9-102(B)(1) and (4).

As to charge II, respondent's actions as administrator of the estate of [C], including his commingling and conversion of estate funds and failure to

account accurately therefor and his deceptive fee charges and fraudulent tax appeals violate disciplinary rules 1-102(A)(3), (4), (5) and (6); 6-101(A)(3); 7-101(A)(2); 7-102(A)(2); 9-102(A); and 9-102(B)(3) and (4). The facts clearly support the illegal and immoral conduct of respondent in using the estate funds for his own purposes and then attempting to cover up such use through a pattern of deceptive and dishonest conduct. He not only failed to provide complete and accurate documentation to the [M] but also continued his cover-up during the investigative stage of this process conducted by petitioner. This deceptive, dishonest and illegal conduct, while in a position of authority and trust with clients, the judicial system and the disciplinary process, constitutes direct violations of the disciplinary rules cited above. Respondent has never fully accounted to the [M] for estate funds and has not released to them deeds and other documents, thereby continuing his violations of such disciplinary rules.

### PRIOR RECORD

Respondent was born in 1945 and was admitted to practice law in Pennsylvania on July 21, 1977. At the time of the filing of the instant petition for discipline, his office was located in [      ]. Based on the address given in the exceptions which respondent filed by letter dated September 2, 1986, he still maintains an office at [      ]. Petitioner submitted respondent's record of previous discipline, which reflects that he had received an informal admonition on January 10, 1983, for violation of DR 1-102(A)(4), (6).

### RECOMMENDED DISCIPLINE

The board concurs with the recommendation of hearing committee [      ] that respondent be

disbarred from the practice of law in any court subject to the supervision of the Supreme Court of Pennsylvania. We believe that the sanction to be imposed in this case is controlled by the direction given in the case of *Office of Disciplinary Counsel v. John J. Keller,* 506 A.2d, 872 (1986) with respect to appropriate circumstances for disbarment. Your honorable court recognized that disbarment is an extreme sanction which must be imposed only in the most egregious cases. The court stated:

"Where an attorney converts and commingles entrusted funds, accomplishes this breach of trust by the use of forged documents, and employs misrepresentations to mask this covert activity, the magnitude of the derelictions and its impact upon the legal profession and the administration of justice requires the imposition of the most severe sanction at our command." 506 A.2d, 879.

The ethical and legal transgressions of respondent in this case are similar to the circumstances justifying disbarment in many other cases. An examination of precedent in this area demonstrates the increasing concern of the board and the court about the gravity of misconduct involving commingling and misappropriation of client funds as reflected in cases resulting in disbarment. See e.g., *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983) (converting and commingling client funds with personal funds warrants disbarment); *Office of Disciplinary Counsel v. Kissel,* supra (forging client's name on check and converting proceeds to personal use warrants disbarment); *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981) (commingling of entrusted funds with personal funds and material misrepresentations warrants disbarment); *Office of*

292

*Disciplinary Counsel v. Lewis,* supra, (commingling and converting of client funds, misrepresenting that certain expenses had been paid warrants disbarment). Certain cases, such as *Lewis,* supra, *Lucarini,* supra, and *Keller,* supra, contain mitigating factors and disbarment was still imposed. In the instant case, there are no mitigating factors, the conduct is at least as egregious if not more egregious, and respondent has demonstrated disdain for the disciplinary system. He has failed to make restitution and still withholds information and documents which came to him by virtue of his office as counsel.

In *Johnson* disbarment case, 421 Pa. 342, 219 A.2d, 593 (1966), the Supreme Court stated:

"The power of a court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public. *The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his professional relations, and if he becomes unworthy, it is its duty to withdraw its endorsement. . . ."* (emphasis added).

## BOARD'S RECOMMENDATION

(1) The disciplinary board recommends to the Supreme Court of Pennsylvania that respondent be disbarred from the practice of law in any court subject to its supervision.

(2) The disciplinary board recommends to the Supreme Court of Pennsylvania that respondent be ordered to pay the costs of investigation and prosecution in this matter.

Ms. Heh did not participate in the adjudication.

## ORDER

And now, this March 27, 1987, upon consideration of the report and recommendation of the disciplinary board dated October 20, 1986, it is ordered that [respondent] be and he is disbarred from the bar of the commonwealth, and he shall comply with all the provisions of Pa.R.D.E. 217. It is further ordered that respondent shall pay costs to the disciplinary board pursuant to Pa.R.D.E. 208(g).