442 A.2d 217

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

**v.**

**Douglas J. KISSEL.**

Supreme Court of Pennsylvania.

Argued Jan. 19, 1982.

Decided March 8, 1982.

Alan J. Davis, Asst. Discip. Counsel, for petitioner.

Richard R. Fink, Doylestown, for respondent.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

The Disciplinary Board of the Supreme Court of Pennsylvania (hereinafter "Board") recommended that respondent, Douglas J. Kissel, be disbarred from the practice of law in the Commonwealth for violations of Disciplinary Rules 7–101(A)(3), 7–102(A)(1), (7) and (8), 9–102(B)(1), (2), (3) and (4), and multiple violations of Disciplinary Rules 1–102(A)(3), (4), (5) and (6).

On May 20, 1980, a Petition for Discipline was filed against respondent by the Office of Disciplinary Counsel.

Hearings were held before Hearing Committee 2.01 and on June 17, 1981, the committee unanimously recommended that respondent be suspended from the practice of law for five years. Exceptions were filed to the recommendation of the hearing committee, and a three-member panel of the Disciplinary Board heard oral argument. Thereafter, on October 28, 1981, the Board issued their report and recommendation, which adopted the hearing committee's findings of fact and conclusions of law. The Board, however, rejected the committee's recommendation of a five-year suspension and instead recommended to this Court that respondent be disbarred from the practice of law.

Pursuant to Pa.R.D.E. 208(e)(2), effective June 27, 1981, we granted respondent's request for oral argument on November 20, 1981. Following argument on January 19, 1982, a thorough review of the record, and careful consideration of the arguments raised in respondent's brief, we conclude, in keeping with the Board's recommendation, that disbarment is the appropriate sanction in this matter.

The following facts are pertinent. In September, 1977, Mr. Wilmer Lovett (hereinafter "Lovett") hired respondent to represent him in real estate legal matters and in the sale of land owned by Lovett. Respondent was to be paid a 10% commission for all land sold, and this amount was to include payment for respondent's legal representation. Lovett also advanced respondent $1,200 at that time. Respondent subsequently became dissatisfied and proposed other fee arrangements to Lovett. Respondent asserted that Lovett agreed to either sign a promissory note in the amount of $6,930 or pay respondent "out of the next settlement." Lovett never signed the promissory note. In fact, respondent claimed he rejected all other fee proposals. The next settlement was with one Fay Parker (hereinafter "Parker") on December 13, 1978.

On February 9, 1978, respondent wrote to Lovett and stated that "all legal matters are at a stop" until respondent secured an acceptable financial agreement with Lovett. On March 5, 1978, respondent again wrote to Lovett and stated

that he could not "put forth anymore effort" for Lovett until he received at least $500. Nevertheless, despite Lovett's refusal to accede to respondent's fee demands, respondent continued to work on behalf of Lovett. In September or October, 1978, based upon respondent's repeated notification that he would refrain from further representation unless Lovett paid him additional fees, Lovett hired a new attorney.

Parker was a recipient of a loan from Lovett which was secured by a mortgage held by Lovett as mortgagee. In November, 1978, Parker contacted respondent, having been referred to him by Lovett's previous attorney, and indicated that she wished to pay off her mortgage. She was never informed that Lovett had obtained new counsel.

On December 7, 1978, respondent wrote to Lovett to verify the amount on the mortgage. Since Lovett believed that Parker would contact him directly, and further, that no settlement could occur without his presence, he never answered respondent's letter. On December 13, 1978, a title officer of the Industrial Valley Title Insurance Company, mailed respondent a check in the amount of $2,059.28, payable to Wilmer Lovett, which represented full payment of the mortgage which had been held by Lovett and which was paid off by Parker. Five days later respondent wrote to Lovett and stated that he had received "the payoff from Mrs. Parker which is being applied to your outstanding legal fees." Respondent concealed the fact that he had in his possession a check payable to Lovett. In fact, Lovett never learned of the check's existence until the investigation by the Disciplinary Board began.

The check contains what purports to be the endorsement of Lovett, above the endorsement of respondent. Lovett never signed the check, and neither respondent nor anyone else requested Lovett's permission to endorse the check in his name. On December 19, 1978, respondent deposited the check, with the forged endorsement, into respondent's personal account at the Union National Bank and Trust Company. By January 2, 1979, respondent had spent the proceeds

for his own use, without the permission or consent of Lovett. Respondent has never made restitution to Lovett.

Also during this time, Lovett's wife received a threatening letter from respondent, urging her to convince Lovett to pay his legal fees. Respondent threatened, should she not comply, to destroy Lovett's files and promised additional "aggressive collection techniques." Additionally, Lovett claims he was harassed by individuals purporting to be from the ABC Collection Agency on numerous occasions. He twice received telephone calls from an unidentified individual, once at 2:15 a. m., who threatened to kill Lovett's 35 hunting dogs unless he paid respondent $4,000.

Despite respondent's letter to the hearing committee stating that he had indeed turned Lovett's account over to the ABC Collection Agency, respondent not only failed to present any evidence as to his non-involvement in the aforesaid collection methods, but he also failed to present any evidence that the ABC Collection Agency even existed. Significantly, Lovett's new attorney testified that respondent admitted to him that the individuals from the alleged collection agency were actually respondent's employees.

Finally, respondent advised Lovett by letter to utilize illegal methods to force his tenants to vacate Lovett's property. To this end he devised a plan to force the tenants to leave, and accepted an $800 check from Lovett to put the plan into action. The plan was ultimately abandoned and the check returned.

We note initially that in attorney disciplinary cases our standard of review is *de novo*. We are not bound by the hearing committee's, nor the Board's, findings, ". . . except as guidelines for judging credibility of witnesses." *Matter of Green*, 470 Pa. 164, 167, 368 A.2d 245, 246 (1977). We further acknowledge that in disciplinary matters our primary task is to protect the public and maintain the integrity of the legal profession. *In re Oxman*, 496 Pa. 534, 437 A.2d 1169 (1981). It is with the above considerations and standards in mind that we dispose of respondent's arguments.

Respondent first argues that there is insufficient evidence to support the finding that he forged Lovett's name on the settlement check in the Parker matter. Specifically, he argues that the above conclusion rests on the mere possession of a forged instrument in contravention of established precedent.

"Evidence is sufficient to prove unprofessional conduct if a preponderance of the evidence establishes the conduct and the proof . . . is clear and satisfactory. *In re Berlant,* 458 Pa. 439, 328 A.2d 471 (1974). The conduct may be proven solely by circumstantial evidence." *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981) (citations omitted). In this case, the evidence is uncontroverted that (1) Industrial Valley Title Insurance Company mailed to respondent a check in the amount of $2,059.28, payable to Wilmer Lovett, as settlement for the Parker mortgage, (2) respondent did not inform Lovett that he received the check, (3) Lovett believed that a settlement could not be made in the Parker matter without his presence, (4) Lovett never signed the above described check, nor authorized respondent or anyone else to sign his name on the check, (5) Lovett never knew that a check, made payable to him for the Parker settlement, existed until he was shown the canceled check, containing what purported to be his signature, by an investigator from the Disciplinary Board, (6) respondent deposited the aforesaid check, with the forged endorsement, into his personal account at the Union National Bank and Trust Company.

There is ample evidence to compel the conclusion that respondent forged Lovett's signature and converted the proceeds to his own use, thereby violating DR 1–102(A)(3), (4), (5) and (6) and concealed from Lovett respondent's possession of a check payable to Lovett in violation of DR 9–102(B)(1), (2), (3) and (4).[1]

1. DR 1–102(A)(3), (4), (5) and (6) state,
   "(A) A lawyer shall not:
       *    *    *    *    *    *
   (3) Engage in illegal conduct involving moral turpitude.

Respondent next claims that there is insufficient evidence to support the conclusion that he utilized intimidating collection methods in an attempt to collect money he contended was owed to him by Lovett. Again, we do not agree. Respondent sent a letter dated April 4, 1979, containing the following threats to Lovett's wife.

"The collection agency I sent Bill's account to indicated they were unable to collect his account. They have informed me that they will sell his account to another organization which employes substantially more aggressive collection techniques.

"I know you will not want to be subjected to the aggravation and annoyance and other tactics used by such organization and suggest you have Bill make one final consideration of my settlement figure of $3000 before I have the account turned over to this other organization.

"If I do not hear from you by April 9, 1979, I will presume Bill is not interested in the settlement. I want to also advise you that I cannot be responsible for Bill's files... Because of a lack of space, I have had to store Bill's files in a place that is neither fire nor waterproof."

\*　　\*　　\*

There was uncontradicted evidence that in April, 1979, two men, purporting to be from the ABC Collection Agency,

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

DR 9–102(B)(1), (2), (3) and (4) state,

"(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

visited Lovett and, in a threatening manner, informed him that they were there to collect Lovett's debt to respondent. On April 9, 1979, at approximately 2:00 a. m. Lovett received a telephone call from an unidentified individual who threatened that either Lovett pay his debt to respondent within three days or he (Lovett) would discover his thirty-five hunting dogs dead. On April 10, 1979, Lovett received a second telephone call containing the same threatening message. Lovett's new attorney testified that he, too, received a telephone call from one of the individuals who had visited Lovett and attempted to collect money for respondent. The unidentified caller stated, "I would like to come in and see you after hours and show you why you ought to tell your client to pay the money right now and I think I can convince you." Lovett's new attorney further testified that respondent admitted to him that the individuals who threatened Lovett were respondent's employees.

It is clear that respondent's use of intimidation in an effort to collect the disputed bill from Lovett constitutes a violation of DR1–102(A)(3), (4), (5) and (6) and DR7–101(A)(3) and 7–102(A)(8).[2]

Respondent next alleges that "[a]lthough the ill conceived plan to drive Lovett's tenant from the property may have come within the ambit of [the] Disciplinary Rules if the plan had been carried out, or even begun, the fact is that the monies were refunded, and all parties withdrew." The "ill

---

2. For the text of DR1–102(A)(3), (4), (5) and (6) see note 1, *supra.*
   DR7–101(A)(3) states,
   "(A) A lawyer shall not intentionally:

   \* \* \* \* \* \*

   (3) Prejudice or damage his client during the course of the professional relationship . . ."
   DR7–102(A)(8) states,
   "(A) In his representation of a client, a lawyer shall not:

   \* \* \* \* \* \*

   (8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

conceived plan" to which respondent refers is described in a letter dated July 21, 1978, from respondent to Lovett.[3]

"I have an individual who shall remain nameless who has agreed to drive the [tenants] out of their property, for the sum of $800 with a guarantee that the job will be done. It will be your responsibility and problem to remove the trailer after the [tenants] have left.

\* \* \* \* \* \*

"I suggest you take advantage of this offer since I want to point out again that the [tenants] will probably take you to the United States Supreme Court if it means they can continue not to pay rent.

"If this method works with [them], I'm sure it can be applied to [your other tenants] for a similar price."

The Board concluded that the nameless individual referred to in respondent's July 21, 1978, letter was Peter Kulish. Kulish testified that a plan was devised whereby he would provoke the tenants, causing them to turn their dogs on him. He and his companions would then be forced to defend themselves with chain saws.[4] This plan was to culminate with the tenants being driven off the property. Respondent accepted, and cashed, Lovett's $800 check, although the money was later returned.

It is clear that respondent took steps to put the plan in action, and it is of no moment that the plan was ultimately abandoned. As petitioner argues in his brief, "it is absurd for respondent to argue that [the Disciplinary Rules] were not violated simply because the plan was ultimately abandoned. In fact, it was *because* the plan was so grossly outrageous and depraved, that the plan was abandoned before it was carried out."

3. In a previous letter to Lovett dated July 1, 1978, respondent stated, "You keep seeking legal solutions to the [tenant] matter. I keep advising you that the best solution lies outside the courtroom."

4. Although the reading of a record rarely evinces tone or inflection, we note the incredulity of a hearing committee member when he asked, "That was the weapon that you were going to have to protect yourself from the dogs?"

Thus, we agree with the Board that the above described conduct by respondent constitutes a violation of DR7–102(A)(1), (7) and (8).[5]

■ "This Court has long recognized the grave nature of disciplinary procedures and our responsibility to exercise our inherent power to impose the extreme sanction of disbarment with caution." *Matter of Leopold,* 469 Pa. 384, 393–94, 366 A.2d 227, 231 (1976). However, we are equally mindful that respondent has failed to conform to the ethics of his profession. In fact, he is guilty of conduct which is illegal, dishonest and deceitful. It is the determination of this Court that respondent be disbarred from the practice of law in the Commonwealth of Pennsylvania and shall comply with Pa.R.D.E. 217.

---

5. DR 7–102(A)(1), (7) and (8) state,
   "(A) In his representation of a client, a lawyer shall not:
      (1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

   *        *        *        *        *        *

      (7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
      (8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.