## In re Anonymous No. 32 D.B. 88

Disciplinary Board Docket no. 32 D.B. 88.

TUMOLO, *Member,* September 13, 1989—Pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d), the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to this honorable court with regard to the above-captioned petition for discipline.

### HISTORY OF THE PROCEEDINGS

Respondent was admitted to practice law in the Commonwealth of Pennsylvania on May 25, 1959. He maintains an office at [ ].

On April 14, 1988, the Office of Disciplinary Counsel filed a petition for discipline containing two charges. Charge I dealt with numerous Disciplinary Rule violations by respondent while he was engaged in the preparation of a will and trust agreement, and his handling of the administration of the decedent's estate.

That charge alleged the following Disciplinary Rules to have been violated:

(A) D.R. 1-102(A)(3), prohibiting illegal conduct involving moral turpitude;

(B) D.R. 1-102(A)(4), prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation;

(C) D.R. 1-102(A)(5), prohibiting conduct prejudicial to the administration of justice;

(D) D.R. 1-102(A)(6), prohibiting conduct adversely reflecting upon an attorney's fitness to practice law;

(E) D.R. 2-106(A), prohibiting an attorney from charging an illegal or clearly excessive fee;

(G) [sic] D.R. 6-101(A), prohibiting an attorney from handling a legal matter which the attorney knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it;

(H) D.R. 6-101(A)(2), prohibiting an attorney from handling a legal matter without preparation adequate in the circumstances;

(I) D.R. 6-101(A)(3), prohibiting neglect of a legal matter;

(J) D.R. 7-101(A)(1), prohibiting the intentional failure to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules;

(K) D.R. 7-101(A)(2), prohibiting the intentional failure to carry out a contract of employment entered into with a client for professional services;

(L) D.R. 7-101(A)(3), prohibiting intentional prejudice or damage to an attorney's client during the course of the professional relationship;

(M) D.R. 9-102(A), generally prohibiting the commingling of clients' funds with the personal funds of the attorney;

(N) D.R. 9-102(A)(2), which provides that funds belonging in part to a client and in part presently or potentially to a lawyer shall be deposited in a separate identifiable bank account, but that the portion belonging to the lawyer maybe withdrawn when due, unless the right of the lawyer to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved;

(O) D.R. 9-102(B)(1), requiring a lawyer to promptly notify a client of the receipt of his funds;

(P) D.R. 9-102(B)(3), requiring an attorney to maintain complete records of all funds of a client coming into the attorney's possession and to render appropriate accounts to the client regarding them; and,

(Q) D.R. 9-102(B)(4), requiring an attorney to promptly pay or deliver to the client as requested by the client, the funds in the possession of the lawyer which the client is entitled to receive.

Charge II alleged that respondent violated D.R. 2-102(B), prohibiting a lawyer from holding himself out to the public as a partner of another lawyer when they are in fact not partners. This charge is of no significance in this proceeding. It was admitted by respondent, but was considered a technical violation which has been rectified.

Respondent filed an answer pro se on May 17, 1988.

On May 25, 1988, this matter was referred to Hearing Committee [   ] comprised of [   ]. [   ], Esq. entered his appearance for respondent on June 13, 1988 and filed an amended answer to the petition for discipline and request to be heard in mitigation on August 19, 1988.

Hearings were held on September 12, 13, and 24, and on October 12, 1988. The hearing committee filed its report on May 9, 1989, and recommended disbarment.

On May 30, 1989, respondent filed a brief on exceptions to the report of the hearing committee and requested oral argument.

Thereafter, pursuant to Disciplinary Board Rules and Procedures 89.201(b), oral argument was heard on June 23, 1989 before a three member board panel consisting of John A. Tumolo, Esq., Frederick W. Hill, Esq., and Judith Heh, Esq. The matter was adjudicated by the Disciplinary Board on June 30, 1989.

## SUMMARY OF THE EVIDENCE

When this matter was before the hearing committee respondent admitted violating the following Disciplinary Rules of the Code of Professional Responsibility:

(1) D.R. 1-102(A)(5), prohibiting conduct prejudicial to the administration of justice;

(2) D.R. 1-102(A)(6), prohibiting conduct adversely reflecting upon an attorney's fitness to practice law;

(3) D.R. 2-106(A), prohibiting an attorney from charging an illegal or clearly excessive fee;

(4) D.R. 6-101(A), prohibiting an attorney from handling a legal matter which the attorney knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it;

(5) D.R. 6-101(A)(2), prohibiting an attorney from handling a legal matter without preparation adequate in the circumstances;

(6) D.R. 6-101(A)(3), prohibiting neglect of a legal matter;

(7) D.R. 9-102(B)(1), requiring a lawyer to promptly notify a client of the receipt of his funds; and

(B) D.R. 9-102(B)(3), requiring an attorney to maintain complete records of all funds of a client coming into the attorney's possession and to render appropriate accounts to the client regarding them.

Petitioner produced various fact witnesses and introduced 138 documentary exhibits, almost all of which were previously stipulated to by respondent. Respondent testified on his own behalf, produced one medical witness, a condition/disposition witness and three character witnesses, and introduced 11 documentary exhibits. Petitioner produced two rebuttal character witnesses.

The facts show that all questionable fees taken by respondent have been paid back to the decedent's beneficiaries and the administration of the estate has been completed, relieving respondent of further duties to the estate. Respondent has not been the subject of any previous discipline in his 30 years of practice.

## DISCUSSION OF FACTS

Due to the complexity of the facts in this case, the board incorporates a format similar to that of the hearing committee's finding of facts. The board's difference with the hearing committee based on its own review of the record, and the arguments of the parties, will be set forth herein.

Respondent was the personal attorney for [A] of [ ] County, Pennsylvania, who in 1979 requested that respondent prepare for him a trust agreement and will. Respondent had little or no previous expe-

rience in the drafting of trust instruments or the administration of trust estates.

On November 26, 1979, [A] executed a funded revocable trust prepared by respondent in which he was the settlor and the [B] Bank was the trustee. The trust as originally drawn provided that upon the death of [A], the trust was to terminate and any remaining principal and interest was to be poured over into [A's] estate and be distributed pursuant to the provisions of his last will and testament. Obviously, this would create a larger estate and increase probate expenses and inheritance taxes. This was not in the client's interest and raises a question as to respondent's intentions. However, at the suggestion of the bank, a trust amendment was prepared, and on November 30, 1979, [A] executed the amendment to the trust which altered the trust to provide that upon the death of [A] the net income of the trust was to be paid to [C] for her life, and upon her death, the income and principal went to [D] of Wisconsin. Since the change in the estate plan occurred within a period of four days this fairly indicates that while respondent was incompetent, doubt is cast as to whether he intentionally mishandled this client for his own benefit. As we will see he made numerous mistakes in the administration of the estate. But, there is reasonable support that these mistakes were grounded in incompetence, and respondent's misguided belief of what he was entitled to.

On November 20, 1979, [A] executed his last will and testament wherein the respondent was designated executor and attorney-in-fact. The will further provided in item 2 that respondent was the sole beneficiary of the estate under a power of attorney by which respondent was to distribute the estate to [A's] "family" as limited by the terms of the funded revocable trust. However, on November 30, 1979,

[A] executed a codicil revoking item 2 of the will executed on November 20, 1979 and substituting as item 2 that the sole heir of the estate was [D]. Again, the correction appears to be necessitated by incompetence since it occurred within a 10-day period.

There is no question that both the trust and will raise questions as to respondent's competency and honesty. It is noted that obvious mistakes were corrected within 10 days which tend to support a totally incompetent handling of this matter, but not a dishonest one.

On March 1, 1982, [A] died having made no further changes or amendments to his will or the trust.

On March 11, 1982, respondent probated the will and codicil in [　] County, Pennsylvania and letters testamentary were issued to him at no. [　] of 1982.

By letter of March 30, 1982, respondent requested the [B] Bank to provide him with a statement of account of the funded revocable trust as of the date of [A's] death. His letter also "cautioned" the bank that the "trust is canceled under the provisions thereof" even though respondent should have known that the original pour-over provisions of the trust agreement had been extinguished by the November 30, 1979 amendment to the trust and the codicil to the will. In essence, respondent was contending that all of the assets in the trust were now part of the estate to be administered by respondent and, ultimately, distributed to [D], the sole beneficiary under the codicil. This was contrary to the admitted revisions outlined above and shows an incompetent, confused attorney. These numerous ridiculous legal positions are in part explained by respondent's insulin overdose which will be discussed below.

The [B] Bank disputed respondent's contention that the trust had been canceled and requested respondent to provide them with some legal authority for his position.

By letter dated April 2, 1982, [D], the sole beneficiary of the estate and the remainderman under the amended trust, advised respondent as executor of the estate that she had no dispute with the manner in which the bank proposed to continue to administer the trust and that respondent was to do nothing in her name or on her behalf to challenge the trust as amended or the will and codicil.

By letter dated May 6, 1982, [D] reiterated that she agreed completely with the trustee's interpretation that the trust had not been terminated or canceled and specifically directed respondent not to use any funds of the estate or of the trust to pursue any contrary interpretations he might have had.

By letter dated June 15, 1982, respondent forwarded to the [B] Bank a three-page "legal opinion" that the trust, as amended, was not revoked but that the principal was subject to the Pennsylvania Transfer Inheritance Tax at the rate of 15 percent. Respondent also contended that the principal of the trust would be subject to attorney expenses. For his "legal opinion," respondent contended he had expended 25 hours at the rate of $100 per hour and was, therefore, entitled to the sum of $2,500 in legal fees. Essentially, respondent's "legal opinion" merely: (1) acquiesced in the position the trustee and the sole heir of the estate had taken; (2) advised that inheritance tax was due on the trust assets (which was not disputed); and, (3) inferred that the trust would owe legal fees—presumably to respondent. Otherwise, the document contained a number of totally irrelevant legal references. It was incorrect as to the taxes and the right to legal fees. Again,

respondent revised his incorrect position, this time, within a period of three months.

By letter dated September 16, 1982, respondent requested the sum of $12,377.30 from the trust to pay the Pennsylvania Inheritance Tax respondent claimed was due on the trust assets; additionally, respondent requested payment of his fee in the amount of $2,500 for his "legal opinion" of June 15, 1982.

On October 21, 1982, at the request of the trustee, respondent filed the trust agreement, amendment, and a first and partial account of the trustee, as had been prepared by the trustee, with the Clerk of Orphan's Court of [   ] County.

By letter dated December 16, 1982, the trustee advised respondent that [D] desired that all estate assets be depleted in payment of all inheritance tax obligations prior to using trust assets for that purpose. The trustee requested information from respondent on what estate assets were available for contribution to the entire inheritance tax obligation. Respondent ignored this inquiry.

On December 22, 1982, respondent filed an inheritance tax return for the estate which was incomplete in that he failed to include in the return, the value of the trust assets.

By letter dated January 11, 1983, the trustee pointed out to respondent the deficiency in the inheritance tax return which he had filed on December 22, 1982.

(A) The trustee provided respondent with a supplemental return, which the trustee had prepared for filing, including a Schedule G (Transfers) and a Schedule K (Life Estate/Annuity Schedule).

(B) The trustee pointed out to respondent that the least costly method of paying the inheritance tax for the trust would be to pay that amount due for the

472

present value of the life estate and to defer payment on the remainderman interest until the death of the life tenant.

(C) The trustee pointed out to respondent that the inheritance tax due for the life tenant would be minimal and that, in accordance with [D's] wishes to first deplete the estate assets, the estate should pay the additional tax due on the trust assets.

On January 12, 1983, the first and partial account of the trustee, which respondent had filed for the trustee on October 21, 1982, was confirmed by the Orphan's Court in [ ] County.

On May 23, 1983, respondent filed the supplemental inheritance tax return and schedules "G" and "K" which had been provided to him by the trustee back in January 1983.

(A) However, instead of following the trustee's instructions to pay only the tax on the present value of the life estate ($19,009.55 times 15 percent is $2,851.43), respondent caused the return to reflect that it was the estate's intention to also prepay the tax on the remainder interest. Thus, the return reflected an additional principal tax due in the amount of $11,913.73 for the decedent's transfers to the trust ($79,424.91 times 15 percent is $11,913.73).

Based on respondent's filing, the Department of Revenue appraised the estate at a total value of $87,559.14 ($8,134.23—net probate assets, plus $79,424.91—trust assets at the date of death).

(A) Had respondent properly submitted the supplemental return, the appraised value of the estate would have been a total of only $27,143.78 ($8,134.23—net probate assets, plus $19,009.55—present value of life estate as calculated on Schedule K).

(B) Had respondent properly submitted the supplemental return, the additional principal tax due

would have been only $2,851.43 ($19,009.55 times 15 percent) instead of $11,903.74 ($79,424.91 times 15 percent).

Upon receipt of the appraisement dated July 25, 1983, respondent failed to take any action to correct the erroneous tax assessment.

On December 8, 1983, the Department of Revenue sent respondent an Administrative Correction (inheritance tax record adjustment) that reflected a total tax and interest then due of only $3,351.37 for the estate. The Department of Revenue had recalculated the tax and interest due based upon the present value of the life estate. Again, respondent's extraordinary incompetence was rectified.

Despite respondent's receipt of this administrative correction dated December 8, 1983, on December 19, 1983 respondent wrote to the trustee and advised: that the tax then due on the trust assets was $13,832.69; that funds in that amount were not available from the estate; that the desire of the sole beneficiary of the estate to deplete estate assets prior to using trust assets was "irrelevant"; and, that the "new Inheritance Tax Code" required immediate payment in full of tax due on both the trust life estate and remainder interest.

In response to respondent's letter of December 19, 1983, on January 4, 1984, the trustee provided respondent with the sum of $13,832.69 for payment of the inheritance tax respondent had claimed was then owed. Respondent paid this amount to the Register of Wills of [   ] County on January 9, 1984.

On February 6, 1984, the Department of Revenue sent respondent an inheritance tax statement of account which reflected respondent's January 9, 1984 payment and a resultant "credit" in the amount of $10,463.31. Upon respondent's receipt of this statement, however, he did nothing for a period

474

of approximately 22 months to secure the return of the overpayment to the trust or to advise the trustee of the availability of those funds.

(A) On or about November 20, 1985, respondent finally obtained a refund of the inheritance tax credit and deposited that $10,463.31 into the estate account on November 26, 1985. However, respondent did not then notify the trustee of his receipt of those funds.

(B) On January 15, 1986, the trustee advised respondent they had just determined the existence of the tax credit and requested that it be turned over to the trust.

(C) By letter dated January 23, 1986, respondent remitted the sum of $10,463.31 to the trustee.

In its letter of January 15, 1986, the trustee also requested an explanation of a bill dated November 7, 1985, wherein respondent contended he was owed the sum of $6,116.76 for professional services *rendered to the trust.*

(A) By letter dated January 23, 1986, respondent explained to the trustee that the $6,116.67 was a billing to the estate which was attributable to work he had allegedly performed for the trust, but which the heir of the estate desired to be assessed against the estate.

(B) However, by letter dated April 2, 1986, respondent advised the trustee that the Orphan's Court would not permit him to charge the estate for work purportedly done for the trust. Respondent requested payment of his fee in the amount of $2,500 for his "legal opinion" of June 15, 1982, and an additional sum of $6,116.65 as a "standard probate fee" for work he had purportedly done for the trust.

There was no basis in fact or law for respondent's contention that the trust owed him a "standard probate fee" of $6,116.65. He seems to have be-

lieved he was entitled to a "standard probate fee" from the trust since he did request the court to approve it. However:

(A) There had been no "probate" of the trust assets and respondent was not responsible for their administration.

(B) Respondent had merely performed the ministerial duties of filing the various trust documents, the supplemental tax return, and appearing before the Orphan's Court for the adjudication of the trustee's first and partial account. For those acts, and his "legal opinion" of June 15, 1982, the trustee had agreed to pay respondent a total fee of $2,500, as reflected in the trustee's first and partial account.

On or about March 8, 1982, respondent advised [D] that as executor and attorney for the estate, respondent would take the "full 10 percent as allowed by law" as his fee for representing the estate.

On April 1, 1982, respondent opened checking account no. [    ] at the [B] Bank as an estate account for the [A] estate.

By letter dated June 15, 1982, respondent provided [D] with a copy of his "legal opinion" to the trustee and a "waiver" form which respondent requested [D] to sign, waiving her interest in the estate.

[D] responded by letter dated July 7, 1982 wherein she advised that she had no intention of signing the waiver respondent had provided since her position and agreement with the trustee's interpretation were clearly and unequivocally stated in her previous letters dated April 2, 1982, and May 6, 1982.

In her letter of July 7, 1982, [D] also asked respondent if he had settled the negligence claim of *[E] v. [A]*, a claim which had arisen as a result of an automobile accident [A] had on September 15, 1980. The facts show that respondent did not properly

explain to [D] that the claim was barred by the statute of limitations and that he had done sufficient work on the claim to justify a fee. The board does not agree that respondent intentionally misled [D]. In fact, the probate shows that Schedule H of the decedent's inheritance tax return clearly listed "*[E] v. [A],* Personal Injury, $1,200" under the subheading of Attorney Fees.

On December 22, 1982, respondent filed an inventory for the [A] estate, which reflected a gross probate estate in the amount of $16,946.57 which, as of that date, consisted entirely of cash.

On the same day, respondent filed an inheritance tax return reflecting a gross probate estate of $16,946.57 and debts and deductions totalling $8,812.34, for a net taxable estate in the amount of $8,134.23.

(A) The inheritance tax return listed the following debts and deductions:

| | |
|---|---|
| [F] Funeral Home | $2,936.00 |
| [G] Memorials | 295.00 |
| [H] Herald | 26.27 |
| [ ] County Reporter | 25.00 |
| Probate and Short Certificates | 97.00 |
| Personal Representative's Commission | 847.33 |
| Attorney's Fee—[Respondent] | 2,500.00 |
| *[E] v. [A],* Personal Injury | 1,200.00 |
| Preparation of 1981 IRS | 500.00 |
| [I] Hospital | 302.10 |
| [J], M.D., P.C. | 83.64 |
| *Total* | $8,812.34 |

(B) The $847.33 personal representative's commission is 5 percent of the gross probate estate ($16,946.57 times 5 percent is $847.33). The $2,500 entry for attorney's fee was a separate fee respondent was charging the estate and was clearly exces-

sive—being almost 15 percent of the gross probate estate of $16,946.57. The $1,200 deduction, for *[E] v. [A],* was a claim by respondent for legal fees.

Respondent failed to take advantage of paying the inheritance tax during the three-month discount period. However, with the filing of the inheritance tax return on December 22, 1982, respondent paid the net tax due, as reflected on the return, of $1,220.15. Additional interest was due in the amount of $14.40 as of that date, which amount respondent subsequently paid on or about April 19, 1983.

Advances from an estate for fees are neither unethical or illegal unless the advance is beyond what the attorney is entitled to. But again respondent's cavalier handling of this probate makes his actions questionable.

On January 3, 1983, by check no. 110 drawn on the estate account, respondent advanced himself the sum of $1,700 from the estate assets for "attorney services."

Respondent paid himself additional "legal fees" by check no. 114, dated May 30, 1983, in the amount of $1,500 drawn on the estate account.

Respondent paid a personal obligation from estate funds by check no. 113, dated May 23, 1983, in the amount of $3,500 payable to "[K] Heating Inc." In a proper advance, the distribution should have gone first to respondent's business account.

After respondent filed the supplemental inheritance tax return and schedules G and K on May 23, 1983, the subsequent appraisement by the Department of Revenue reflected the sum of $11,913.73 as the principal tax due on the transfers to the trust.

On or about July 20, 1983, the inheritance tax personnel again appraised the estate and determined the total tax and interest then due was $13,277.82.

478

On August 2, 1983, respondent negotiated a check on the estate account in the amount of $5,000 as another advance on fee.

On October 5, 1983, by check no. 117 drawn on the estate account for $400 with the notation "Legal Fees IRS Tax Ret." and payable to respondent, respondent paid himself that sum from the estate. Payment for any tax returns respondent may have completed and filed for the decedent should have been included in the fees and commissions of $1,700 which respondent had taken on January 3, 1983. By the negotiation of this check, respondent reduced the balance in the estate account to the sum of $39.18.

On March 7, 1984, and November 30, 1984, [D] wrote to respondent inquiring into the status of the estate. Respondent failed to reply to either letter.

By letter to respondent dated March 5, 1985, Attorney [L], representing [D], inquired into the status of the estate and specifically wanted to know when the estate would be closed, why it had not been closed, where the assets were invested, and when the final account would be filed. Despite the request for a response by March 15, 1985, respondent failed to reply.

On December 24,, 1985, respondent filed with the [ ] County Orphans' Court what he designated as the "Second and Partial Account of the Estate of [A], Deceased, by [Respondent], Executor."

(A) While this document purported to be an accounting of the estate assets received and disbursed by respondent as executor, it did not comply with the format requirements of Rule 6.1 of the Orphan's Court Rules and failed to set forth specifically what assets he had received, when he received them, what assets he had disbursed, when he had

disbursed them, or what assets he currently held and how he proposed to distribute them.

(B) Since respondent had not previously filed any accounting for the estate, this was actually his "first" accounting.

Respondent's accounting filed December 24, 1985 indicated the following:

(A) "Principal Debits" in the amount of $16,946.57, which figure was consistent with the figures set forth in the inventory and inheritance tax return respondent had filed back in December 1982. However, respondent failed to list and account for the sum of $437.15 in interest he had received on May 13, 1983 upon the maturity of a $10,000 certificate of deposit.

(B) "Principal Credits" totalling $8,860.34, which credits included those items respondent had listed in Schedule H of the Inheritance Tax Return filed on December 22, 1982, plus an additional credit of $48 for "Filing Fees, Notary, Etc." However, respondent did not list and account for the payments of $1,220.13 and $14.40 he had made towards the inheritance tax liability of the estate from the estate account. Said payments had been made on December 22, 1982 and April 19, 1983, respectively.

(C) A "Principal Credit" of $2,500 as "Attorneys Fee, [Respondent], Esq."

(D) A "Principal Credit" of $1,200 for "[E] v. [A], Personal Injury."

(E) A "Principal Credit" of $500 for "Preparation of 1981 IRS." If respondent did prepare the decedent's 1981 tax returns, his fee for doing so would have been included in his ordinary fee as attorney for the estate and, therefore, this additional $500 fee was clearly excessive.

(F) A "Principal Credit" in the amount of $847.33. This same figure of $847.33 was previously

480

listed on his statement of debts and deductions filed December 22, 1982 as "Personal Representative's Commission" and amounts to exactly 5 percent of the gross probate estate of $16,946.57.

Respondent's accounting filed December 24, 1985 also contained a separate page captioned: "Recapitulation of [B] Bank & Trust Company Trustee Trust Account" which purported to be a form of accounting related to the trust.

(A) This accounting failed to comply with the format requirements of. Rule 6.1 of the Orphans' Court Rules.

(B) Respondent had no authority from the trustee to submit any such accounting on its behalf.

(C) Under "Principal Credits" respondent listed $2,500 for "Attorney Fee, Will and Trust Services Reserve, Legal Memo" which was a reference to the $2,500 fee respondent charged the trust back in June 1982 and which had been reserved in the first and partial accounting of the trust filed on October 21, 1982.

(D) Under "Principal Credits" respondent listed $13,832.69 for "Prepared Inheritance Tax." This was, apparently, a reference to the tax paid on the trust assets. However, the account failed to reflect receipt of the refund of $10,463.31 from the Department of Revenue on November 26, 1985, even though the account was not filed until December 24, 1985.

(E) Under "Principal Credits" respondent also listed $6,116.67 as "Standard 5 Percent Fee Probate Trust, Attorney [Respondent]." By this entry, respondent was asking the Orphan's Court to approve an additional legal fee against the trust for $6,116.67. That amount is 5 percent of $122,333.30, the gross receipts of the trust as listed in the trustee's first and partial account filed October 21, 1982. As such, it

reflected assets accumulated after the date of death of the decedent and was far in excess of the value of the trust assets which were used for inheritance tax purposes, i.e., $79,424.91. Respondent's claim for fees concerning trust matters and the mishandling of the estate probate clearly illustrate respondent's lack of knowledge and understanding of estate and trust laws.

In early January 1986, the trustee received from respondent a statement dated November 7, 1985 by which respondent contended he was owed $6,116.67 for professional services rendered.

By letter dated January 15, 1986, the trustee requested respondent to provide information on what services were covered by the $6,116.67 statement of November 7, 1985. Additionally, the trustee had at that time determined the existence of the $10,463.31 tax credit and questioned respondent as to why there was a credit, whether respondent had applied for it, and if it had been received by respondent, why had it not been returned to the trust.

By letter dated January 23, 1986, respondent replied to the trustee and remitted the sum of $10,463.31 to the trust by check no. 125 dated January 20, 1986 drawn on the estate account. As to his $6,116.67 statement, respondent contended it was a bill to the estate which the estate heir, [D], did not want "charged against the estate trust account."

On February 19, 1986, the estate accounting respondent had filed on December 24, 1985 came up for audit before the Orphan's Court.

At the audit on February 19, 1986, during a colloquy with the court, respondent attempted to have the court approve his contention that the trust owed him a total of $8,616.67 ($2,500 plus $6,616.67) in legal fees. Respondent stated to the court:

"The only point in my second and partial, if it pleases the court, is that in my initial presentation there was no assessment of the legal fee for the work done on the estate trust and I am just here today asking, you know, the court rule on the charge for legal fees as against the trust."

The court responded by asking respondent if this was the second and partial account of the personal representative in the decedent's estate and respondent incorrectly stated that it was. In fact, this was respondent's "first" account for the estate.

Respondent made numerous other mistakes in representations to the Orphan's Court relative to his accounting filed December 24, 1985. In his petition for Audit on February 18, 1986, respondent stated:

(A) In item II that [C] was a life tenant, when, in fact, she had no interest in the estate;

(B) In item II that [D] had a remainder interest when, in fact, she was the sole heir to the estate; and,

(C) In item VIII that all parties in interest had actual notice of respondent's filing of the accounting and the audit when, in fact, respondent had not notified anyone of either the submission of his accounting or of the audit.

By letter dated April 2, 1986, respondent advised the trustee that the Orphan's Court would not allow respondent to offset against the estate legal fees for services rendered to the trust. Respondent demanded payment of the $2,500 he had billed the trust for back in June 1982, and "the standard probate fee for attorney filing trust" in the amount of $6,116.65.

On May 23, 1986, respondent filed with the Orphan's Court a document captioned "First and Final Account of the Estate of [A], Deceased, by [Respondent], Executor."

(A) This was, in fact, the "second" accounting respondent had filed for the estate, and it, too, failed to comply with the requirements of Orphans' Court Rule 6.1.

(B) In this accounting, respondent again failed to charge himself with the interest income of $437.15 received on May 13, 1983.

(C) Under the heading "Principal Credits" respondent continued his claim for $1,200 relative to the claim of [E] against the decedent.

(D) Respondent claimed "Principal Credit" of $500 for "Preparation of 1979 IRS." However, in both the inheritance tax return filed on December 22, 1982 and the accounting filed December 24, 1985, respondent showed one "Principal Credit" of $500 for "Preparation of 1981 IRS."

(E) Respondent claimed "Principal Credit" of $847.33 for "Preparation of 1980-81 IRS." In neither the inheritance tax return nor the accounting filed December 24, 1985 did respondent show a charge or credit for preparation of 1980 and 1981 tax returns. In both of those documents, respondent did show a charge or credit in the amount of $847.33 for a personal representative's commission.

On May 23, 1986, with his accounting, respondent filed a petition for audit which was exactly the same as that which he had filed with the accounting of December 24, 1985. It contained the same mistakes as set forth previously.

Despite the fact that respondent's accounting filed May 23, 1986 reflected a balance for distribution of $7,651.20, the estate account at that time only contained the sum of $39.18 because of respondent's previous withdrawals.

By letter dated September 9, 1986, respondent sent [D] a copy of the accounting he had filed on May 23, 1986 (wherein respondent had reduced his

claimed "Attorney Fees" from $2,500 to $1,700 pursuant to informal instructions from the Orphan's Court) and advised [D] it would be audited on September 17, 1986. Respondent's letter stated "court-ordered lists of audits is attached," but the document respondent enclosed was not the August-September 1986 list of audits, but rather that of January 10, 1986 on which respondent had altered the dates.

[D] retained legal counsel to file objections to respondent's accounting. On September 16, 1986, objections were filed and the audit scheduled for September 17, 1986 was generally continued pending resolution of [D's] objections to respondent's accounting.

Thereafter, [D's] attorney entered into negotiations with respondent in an attempt to settle [D's] claims against the estate. A settlement was reached.

On or about June 1, 1987, [D] signed a release, releasing respondent from any and all claims she may have had against him as attorney and executor of the estate of [A], in return for the receipt of $10,231.21 from respondent.

On June 18, 1987, [D] and respondent entered into a stipulation wherein it was agreed that respondent would amend the accounting he had filed on May 23, 1986, to reflect that his attorney fee would be $850, his executor's commission would be $847.32, and that all other claims for attorney fees would be withdrawn.

Respondent has never filed such an amended accounting, but for all practical purposes, with respondent's payment of $10,231.21 to [D] pursuant to the settlement agreement he concluded his duties and responsibilities as executor and attorney for the estate—almost five years after they had begun.

There are mitigating factors to this morass of errors. Those will be discussed below.

## CONCLUSIONS OF LAW

When this matter was submitted to the hearing committee, respondent admitted to having violated eight Disciplinary Rules of the Code of Professional Responsibility (see p. 466, *supra*). Based upon that admission and additional factors, the Disciplinary Board concludes that evidence establishes violations of the following:

(1) D.R. 1-102(A)(5), prohibiting conduct prejudicial to the administration of justice;

(2) D.R. 1-102(A)(6), prohibiting conduct adversely reflecting upon an attorney's fitness to practice law;

(3) D.R. 2-106(A), prohibiting an attorney from charging an illegal or clearly excessive fee;

(4) D.R. 6-101(A)(1), prohibiting an attorney from handling a legal matter which the attorney knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it;

(5) D.R. 6-101(A)(2), prohibiting an attorney from handling a legal matter without preparation adequate in the circumstances;

(6) D.R. 6-101(A)(3), prohibiting the neglect of a legal matter;

(7) D.R. 7-101(A)(1), prohibiting the intentional failure to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules;

(8) D.R. 7-101(A)(3), prohibiting intentional prejudice or damage to an attorney's client during the course of the professional relationship;

486

(9) D.R. 9-102(B)(1), requiring a lawyer to promptly notify a client of the receipt of the funds;

(10) D.R. 9-102(B)(3), requiring an attorney to maintain complete records of all funds of a client coming into the attorney's possession and to render appropriate accounts to the client regarding them; and,

(11) D.R. 9-102(B)(4), requiring the attorney to promptly pay or deliver to the client, as requested by the client, the funds in the possession of the lawyer which the client is entitled to receive.

## DISCUSSION

It should be noted that Hearing Committee [   ] did an exceptional job handling this matter in light of the voluminous nature of these proceedings. The notes of testimony consist of 898 pages, there are over 140 separate documentary exhibits consisting of over 500 pages, petitioner's brief to the hearing committee was 118 pages in length, respondent's brief was 77 pages long, and the hearing committee report itself was 60 pages long. Much thought and consideration has gone into determining respondent's fate.

We find respondent guilty of all Disciplinary Rules that he has admitted, plus three that deal directly with an attorney's duties towards "clients":

(A) D.R. 7-101(A)(1), prohibiting the intentional failure to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules;

(B) D.R. 7-101(A)(3), prohibiting intentional prejudice or damage to an attorney's client during the course of the professional relationship;

(C) D.R. 9-102(B)(4), requiring the attorney to promptly pay or deliver to the client as requested by

the client, the funds in the possession of the lawyer which the client is entitled to receive.

We agree with petitioner and the hearing committee that respondent, in his joint capacity as executor and attorney for the decedent's estate, owed a clear fiduciary duty to the sole beneficiary of the estate. There was a sufficient attorney-client relationship between respondent and the sole beneficiary under those circumstances to provide a legal basis for the hearing committee's conclusions that respondent violated D.R. 7-101(A)(1) and (3) and D.R. 9-102(B)(4). This determination is in accord with the holding of *In re Anonymous No. 58 D.B. 81*, 26 D.&C. 3d 184 (1983).

Having concluded that respondent is guilty of violating 11 Disciplinary Rules (eight of which are admitted by respondent), we must now determine the appropriate form of discipline warranted in this case.

The Supreme Court of Pennsylvania stated in *Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 506 A.2d 872 (1986), that the "primary purpose of our system of lawyer discipline is to protect the public from unfit attorneys and to maintain the integrity of the legal system." *Id.* at 579, 506 A.2d at 875. The court in *Keller* went on to set the standard in Pennsylvania for the evidentiary requirements when determining attorney misconduct: "Evidence in a disciplinary proceeding is sufficient to prove ethical misconduct if a preponderance of that evidence establishes the charged violation and the proof is *clear and satisfactory.*" *Id.* at 580, 506 A.2d at 875. (emphasis supplied) Although we agree almost entirely with the findings and conclusions of the hearing committee, we do not see clear and satisfactory evidence that respondent is guilty of having violated Disciplinary Rules that involve

moral turpitude, fraud, and deceit. These particular Disciplinary Rules require an "intentional" or "knowing" element often referred to as "scienter." The evidence is strong that respondent had a lack of knowledge which resulted in his numerous incompetent acts, but not the scienter which is needed to violate the above-mentioned rules.

There are mitigating factors to be considered in determining the appropriate recommendation for discipline resulting from those rules we have found were violated. We find credence in Dr. [M's] testimony that throughout the time period that respondent was administering the estate, his judgment was impaired through no fault of his own. (N.T. 421 et seq.) Dr. [M] testified that the large amount of insulin ingested by respondent resulted in a protracted period of severe, adverse physical and mental consequences, including hypoglycemic or insulin reactions and insulin shock that impaired respondent's judgment and memory. (N.T. 403 et seq.) These insulin overdoes which were being prescribed to him by his physician to treat his diabetes combined with his inexperience in handling estate and trust matters led him to make irrational decisions at times. Many of the incompetent, irrational acts of respondent were reversed within a period of days. Respondent faced other mitigating circumstances, including a notice from his landlord that he would have to leave his office and find new space; admission to The [I] Hospital for nine days in late September and early October 1983, due to episodes of presyncope which was diabetes-related; and other disruptive office problems relating to the loss of his secretary and a rift with the attorney with whom he had shared office space for many years. (N.T. 402 et seq., 466 et. seq., 559 et seq.) These illnesses and

circumstances do not excuse respondent's behavior, but merely mitigate the discipline we will recommend.

No two disciplinary cases are ever exactly alike, hence the Pennsylvania Supreme Court has rejected a per sé rule requiring disbarment in all cases. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). There are, however, certain guidelines that must be followed when deciding punishment. The majority of cases that resulted in disbarment involved intentional misrepresentations and fraud such as *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 217 (1982), in which respondent was found guilty of forging a client's name on a check and converting the proceeds to personal use. The court in *Kissel, supra,* stated that disbarment is an extreme sanction which must be imposed only in the most egregious cases.

Respondent has practiced law without any other disciplinary incidents during the course of his 30 years. He enjoys the respect of prominent members of the bar as exemplified by the testimony of his character witnesses, Messrs. [N], [O] and [P]. He has settled his dispute over fees with the complainant by paying her in full and completing the administration of the estate. He has affiliated himself with a member of the local bar, Attorney [Q], who has made himself available to respondent for advice and assistance. He is currently under proper medication for treatment of his diabetes and has handled his practice without incident apart from these charges. We therefore find that although respondent's incompetence and neglect are egregious, he should not be disbarred. Rather an appropriate period of suspension, during which time respondent can organize what has become a totally disorganized personal and professional life, is proper.

## RECOMMENDATION

The Disciplinary Board unanimously recommends that [respondent] be suspended from the practice of law for a period of three years. The board further recommends that [respondent] be ordered to pay the costs of investigation and prosecution in this matter.

Messrs. Douglas, Gilardi and Stoelker and Miss Heh did not participate in the adjudication.

## ORDER

And now, May 23, 1990, the rule issued upon respondent on March 21, 1990, to show cause why he should not be disbarred is discharged and the report and recommendation of the Disciplinary Board dated September 13, 1989, are accepted. It is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of three years, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Larsen dissents.